ESTATE OF FLOYD G. PAXTON, JERRE PAXTON, EXECUTOR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Paxton v. Commissioner
Docket Nos. 4639-76, 4644-76, 4645-76, 4647-76, 4648-76.
United States Tax Court
T.C. Memo 1982-464; 1982 Tax Ct. Memo LEXIS 285; 44 T.C.M. (CCH) 771; T.C.M. (RIA) 82464; August 9, 1982. *285 Floyd Paxton, the decedent of the petitioner estate invented and patented plastic closures. He licensed the patents to corporation Y which, in turn, granted its subsidiary, petitioner corporation I, non-exclusive licenses to exploit the patents. Paxton later invented and patented plastic closures with labels attached and assigned these latter patents to IDT, a family trust. IDT sold the patents to petitioner corporation Y, which then granted petitioner corporation I an exclusive license to exploit the patents. The corporation granted an exclusive license to another petitioner corporation. Held: The patents for closures with labels are not embodied in the earlier patent for closures without labels; therefore, all of the transactions among the parties are effective for tax purposes. In an earlier proceeding we held that the income of PFT trust was taxable to petitioner grantor because the grantor's son, a trustee, did not hold a substantial adverse interest. That decision was affirmed, based, in part, upon the size of the son's ownership in the trust which was not the rationale of our holding. In the instant proceeding the son owns a larger interest in the trust. Held: The doctrine *286 of collateral estoppel does not apply because there has been a change in facts which form the basis of the opinion of the Court of Appeals. Held further: Based upon the facts presented in this proceeding the son does not hold a substantial adverse interest and the income of the PFT trust is taxable to the grantor. Individual petitioners created IDT trust, naming son as trustee. Held: Petitioner grantor's son holds a substantial adverse interest in IDT and tis income is not taxable to individual petitioners. Meade Emory,Peter M. Lind,W. C. Rutherford,Woolvin Patten,Leon C. Misterek,Richard Hunt, and Daniel Woo, for the petitioners. Kenneth McWade, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in the Federal income taxes of petitioners for the indicated taxable years: Docket No.
Petitioner
Taxable Year
Deficiency
Ending
4639-76
Estate of Floyd G.
Dec. 31, 1969
$179,666.31
Paxton, Jerre
Dec. 31, 1970
221,038.60
Paxton, Executor
Dec. 31, 1971
246,449.71
4644-76
Grace D. Paxton
Same as Estate of
Floyd G. Paxton
(joint returns)
4645-76
International
June 30, 1970
$179,974.44
Development Trust
June 30, 1971
89,594.21
4647-76
Kwik-Lok Corporation
March 31, 1967
$ 36,414.00
of Yakima
March 31, 1968
1,826.26
March 31, 1970
16,532.15
March 31, 1971
59,636.05
March 31, 1972
53,251.72
4648-76
Kwik-Lok Corporation
March 31, 1970
$120,413.59
of Indiana
March 31, 1971
129,147.81
March 31, 1972
134,176.00
*287 After concessions, [2] these are the issues we must herein decide: (1) whether certain patents which were purportedly sold by International Development Trust to Kwik-Lok Corporation of Yakima, and then licensed by that corporation to its subsidiaries, Kwik-Lok Corporation of Indiana, were, by reason of earlier transactions, already owned by (or licensed to) such corporations; (2) whether, if such patents were not already owned by or licensed to such corporations, the amounts paid for such patents and licenses were reasonable; (3) whether, if some portion of the amounts paid to International Development Trust by Kwik-Lok Corporation of Yakima for such patents is not attributable to a reasonable purchase price, such amounts constitute taxable income received directly or indirectly by International Development Trust, a non-shareholder of Kwik-Lok Corporation of Yakima; (4) whether the petitioners, Estate *288 of Floyd G. Paxton, Jerre Paxton, Executor, and Grace D. Paxton, are collaterally estopped from denying that they are to be treated as the owners of all or a portion of the F. G. Paxton Family organization, a trust, under the grantor trust provisions, because of our decision in Paxton v. Commissioner,57 T.C. 627 (1972), affd. 520 F.2d 923 (9th Cir. 1975); and (5) whether Floyd and Grace Paxton are to be treated as having been, during the taxable years involved, the owners of two trusts (International Development Trust and, assuming respondent loses on the collateral estoppel issue, F. G. Paxton Family Organization). FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner in docket No. 4639-76 is the Estate of Floyd G. Paxton, deceased (hereinafter Estate of Paxton). Floyd G. Paxton (hereinafter Floyd Paxton) died on December 10, 1975, and his estate was admitted to probate in the Superior Court of Yakima County, Washington. Jerre Paxton is the duly appointed, qualified and acting executor of that estate. At all relevant times, Jerre Paxton was a resident of Yakima, *289 Washington. Floyd Paxton was one of the taxpayers named in the statutory notice of deficiency mailed to Mr. Floyd G. Paxton and Mrs. Grace D. Paxton on February 26, 1976. During the calendar years 1969, 1970 and 1971, he was married to Grace D. Paxton (hereinafter Grace Paxton). During the years just mentioned, Floyd and Grace Paxton resided in Yakima, Washington. For each of these years 1969, 1970 and 1971 they filed joint Federal income tax returns (Forms 1040 and 1040X) with the Internal Revenue Service Center, Odgen, Utah. Floyd and Grace Paxton kept their records and filed their tax returns on the calendar year basis and accounted for their income on the cash basis. Petitioner in docket No. 4644-76 is Grace D. Paxton, one of the taxpayers named in the above-referenced statutory notice of deficiency mailed to Floyd and Grace Paxton on February 26, 1976. Grace Paxton resided, when the petition herein was filed, in Yakima, Washington. The issues involved in docket Nos. 4639-76 and 4644-76 concern the joint and several liability, if any, for deficiencies in Federal income taxes of the Estate of Floyd G. Paxton and of Grace Paxton, arising out of joint Federal income tax returns *290 filed by Floyd G. Paxton and Grace Paxton. Petitioner in docket No. 4645-76 is International Development Trust (hereinafter IDT). IDT is an inter vivos trust created and existing under the laws of the State of Washington. IDT has its principal place of business in Yakima, Washington. The managing fiduciary of IDT was at all times here pertinent, and is, Jerre Paxton, a resident of Yakima, Washington. IDT kept its records and filed its tax returns on the basis of a fiscal year ending on June 30 and accounted for its income on the cash basis. The fiduciary returns (Forms 1041) of IDT for the taxable year ending June 30, 1970 and 1971 were filed with the Internal Revenue Service Center, Ogden, Utah. The Commissioner issued a notice of deficiency to IDT dated February 26, 1976, in which he determined deficiencies in income tax as set forth above. Petitioner in docket No. 4647-76 is Kwik-Lok Corporation of Yakima (hereinafter Kwik-Lok Yakima). Kwik-Lok Yakima is a corporation organized under the laws of the State of Washington. At all relevant times, Yakima, Washington, has been the principal place of business for Kiwk-Lok Yakima. At all times here pertinent, Kwik-Lok Yakima *291 kept its books and filed its Federal income tax returns on the basis of a fiscal year ending on March 31 and accounted for its income on the accrual method. Its Federal corporate income tax returns (Forms 1120 and 1120X) for the taxable years ending March 31, 1967, 1968, 1968 amended, 1969, 1969 amended, 1970, 1970 amended, 1971, and 1972 were filed with the Internal Revenue Service Center, Ogden, Utah. The Commissioner issued a notice of deficiency to Kwik-Lok Yakima dated February 26, 1976, in which he determined deficiencies in corporate income taxes as set forth above. Petitioner in docket No. 4648-76 is Kwik-Lok Corporation of Indiana (hereinafter Kwik-Lok Indiana). Kwik-Lok Indiana is a corporation organized under the laws of the State of Indiana with its principal place of business, at all relevant times, in New Haven, Indiana. At all times here pertinent, Kwik-Lok Indiana kept its books and filed its Federal income tax returns on the basis of a fiscal year ending on March 31 and accounted for its income on the accrual method. Its Federal corporate income tax returns (Forms 1120 and 1120X) for the fiscal years ending March 31, 1970, 1970 amended, 1971 and 1972 were filed *292 with the Internal Revenue Service Center, Ogden, Utah. The Commissioner issued a notice of deficiency to Kwik-Lok Indiana dated February 26, 1976, in which he determined deficiencies in corporate income taxes as set forth above. In response to each notice of deficiency heretofore described, the taxpayers to whom they were addressed filed timely petitions with this Court. F. G. Paxton Family Organization (hereinafter PFT) is an inter vivos trust created and existing under the laws of the State of Washington. At all relevant times, Yakima, Washington, has been the principal place of business for PFT. The managing fiduciary of PFT was at all times here pertinent, and is, Jerre Paxton, a resident of Yakima, Washington. PFT kept its records and filed its tax returns on the basis of a fiscal year ending June 30 and accounted for its income on the cash basis. PFT filed fiduciary returns (Forms 1041) for its fiscal years ending June 30, 1968 through June 30, 1972, with the Internal Revenue Service Center, Ogden, Utah. No statutory notices of deficiency were issued to PFT with respect to any of the aforementioned fiscal years. Floyd Paxton was born March 7, 1918, in Redlands, California, *293 the son of Hale and Geraldine Paxton. The children of this marriage were Floyd Paxton, Allen Dent Paxton and Madeline Paxton. Floyd Paxton married Eleanor Leighy (hereinafter Eleanor Paxton) on March 7, 1936. The children of this marriage and their birth dates were: Name
Date of Birth
Jerre Paxton
November 24, 1938
Ted Paxton
September 26, 1940
Floyd G. Paxton, Jr.
February 23, 1950
Cheryl Paxton
March 14, 1952
Floyd and Eleanor Paxton resided in Riverside, California, until about 1954. Prior to the period here in question, Floyd Paxton and Allen Dent Paxton organized Paxton Machines, Inc., a California corporation engaged in the business of manufacturing box-making and labeling equipment useful primarily in the packaging of fruit. Paxton Machines, Inc., also manufactured a few mechanical items, such as universal joints. This business was located in Riverside, California. This corporation's existence was terminated in about 1960. Floyd Paxton also operated Paxton Products Co., a sole proprietorship also located in Riverside, California. Floyd and Eleanor Paxton were the sole owners of Paxton Products Co., which engaged in the business of manufacturing products from paper and synthetic *294 materials, principally plant covers and other items connected with agricultural products. Early in 1954, Floyd Paxton and Eleanor Paxton were divorced. Eleanor Paxton was awarded custody of the four children. In the divorce proceedings the assets of Paxton Products were awarded to Eleanor Paxton, who operates the business to this day. With the earnings from this business, Eleanor Paxton supported herself and the children she bore by Floyd Paxton. Jerre Paxton lived with his mother until his marriage to Nancy DeNyse Wheeler (hereinafter Nancy Paxton). In or about 1963, he and his wife moved to Yakima, Washington. Jerre Paxton never lived with Floyd and Grace Paxton. In or about 1954, Floyd Paxton moved from California to the State of Washington. In July 1954, Floyd Paxton married Grace Douglas (hereinafter Grace Paxton). Grace Paxton was born July 19, 1916. She had formerly been married to Fred Tyler Douglas. Grace had one child by her marriage to Mr. Douglas, a daughter, Diane, who was a teenager in 1954. Diane Douglas (hereinafter Diane Irwin) subsequently married Jere Irwin. Grace and Floyd Paxton had one child, a son named Ande Paxton, born December 7, 1956. After *295 their marriage, Floyd and Grace Paxton lived in Yakima. Grace Paxton's daughter, Diane, lived with them prior to her marriage to Mr. Irwin. No children from Floyd Paxton's first marriage ever lived in the household which Floyd and Grace Paxton established. On November 12, 1954, Floyd Paxton, together with his cousin Kenneth Paxton and Kenneth's wife, Dorothy Paxton, signed Articles of Incorporation, as incorporators, for Kwik-Lok Yakima. The issued and outstanding stock of Kwik-Lok Yakima consisted of 500 shares of class A voting stock and 1,471 shares of class B nonvoting stock. At the beginning of 1965, Floyd and Grace Paxton, through original issue, stock dividends and purchase, owned all of the outstanding stock of Kwik-Lok Yakima. By March 1965, the outstanding shares of Kwik-Lok Yakima were owned as follows: Recipient
Class A
Class B
Floyd and Grace Paxton
395
1,147
Jerre Paxton
53
135
Ted Paxton
52
135
Allen Dent Paxton
0
34
Phil Crawford, et ux. (employee)
0
20
Totals
500
1,471
On or about July 14, 1965, Jerre Paxton acquired the 34 class B shares owned by Allen Dent Paxton. Consequently, as of mid-1965, the stock of Kwik-Lok Yakima was held as follows: Class A
Class B
Floyd and Grace Paxton
395
1,147
Jerre Paxton
53
169
Ted Paxton
52
135
Phil Crawford
0
20
Total
500
1,471
The *296 principal officers and directors of Kwik-Lok Yakima during the fiscal years ended March 31, 1965 through 1972 were as follows: Dates
Directors
Officers
3/31/65
Floyd Paxton
President
Floyd Paxton
to
Francis Max Baer
Vice President
Francis Max Baer
7/6/65
Donald Loudon
Secretary -
Jerre Paxton
Treasurer
Donald Loudon
Allen Paxton
7/6/65
Floyd Paxton
President
Floyd Paxton
to
Francis M. Baer
Vice President
Jerre Paxton
3/15/68
Jerre Paxton
Vice President-
Canadian Op.
Donald Loudon
Op.
L. E. Peck
Secretary -
Treasurer
Donald Loudon
3/15/68
Floyd Paxton
President
Jerre Paxton
to
Francis M. Baer
Vice President
Lorne House
2/31/72
Jerre Paxton
Vice President-
Donald Loudon
Canadian Op.
L. E. Peck
Secretary-
Treasurer
Donald Loudon
On April 20, 1960, Kwik-Lok Indiana was organized under the laws of the State of Indiana. Immediately after its incorporation, Kwik-Lok Indiana's issued and outstanding capital stock consisted of 150 shares of common stock. Kwik-Lok Yakima owned 149 shares and Floyd and Grace Paxton together owned one share. Some time prior to August 1967 Kwik-Lok Indiana declared stock dividends in the ratio of two shares of stock for each share outstanding. As result of this stock dividend, the issued and outstanding shares *297 of the corporation were increased to 450, of which 447 were owned by Kwik-Lok Yakima and three were owned by Floyd and Grace Paxton. The principal officers and directors of Kwik-Lok Indiana for the fiscal years ended 31, 1970, 1971 and 1972 were as follows: Directors
Officers
Jerre Paxton
President
Jerre Paxton
Philip Crawford, Jr.
Vice President
Philip Crawford, Jr.
Secretary-
Mickey M. Miller
Treasurer
Floyd Paxton
Mickey M. Miller
On October 1, 1962, Paxton Industries, Inc., was organized under the laws of the State of Washington with a capitalization consisting of five shares of $100 par value, three of which were issued to Floyd Paxton, one to Francis M. Baer and one to Donald Loudon. Prior to August 1967, Floyd Paxton acquired all the shares of Paxton Industries. In November 1966, Floyd Paxton was hospitalized for advanced arteriosclerosis. He was advised that he would require specific therapy and, probably, bypass surgery. On March 16, 1968, Floyd Paxton resigned as president of Kwik-Lok Yakima and Kwik-Lok Indiana. On March 29, 1968, he executed a consulting contract with Kwik-Lok Yakima. Patent Issues
About 1952 or 1953, Floyd Paxton began to make individual bag-closing devices *298 (hereinafter "single loks") out of plastic. These single loks were used to close flexible plastic bags, especially bags made of cellophane, polyethylene and various synthetics. The single lok was a rectangular piece of plastic, with a rounded butt at one end and an aperture at the other end permitting it to be placed around the neck of a flexible bag. The device was later described in U.S. Patent No. 2,705,100, which covered a bag-closing machine described below, as a "closure of flexible sheet material structurally characterized to enable it to be readily sprung or snapped over a tightly twisted or constricted portion of the bag mouth, in a manner to be securely maintained attached to the bag yet be readily removable and replaceable indefinitely." On July 30, 1953, Floyd Paxton applied for a U.S. patent on the single lok device under application Serial No. 371,229. The application for patent was denied by the U.S. Patent Office. Sometime prior to 1954, Floyd Paxton and Allen Dent Paxton manufactured a hand-operated machine by which single loks could be fed from a hopper or magazine and used to close plastic bags without having to twist the necks of the bags. Floyd and Allen Dent *299 Paxton applied for a patent on this machine. At the same time this patent application was filed, Floyd and Allen Dent Paxton executed an assignment of the invention to Paxton Machines, Inc. With certain claims in the application disallowed, Patent No. 2,705,100 was issued on March 29, 1955, with Floyd and Allen Dent Paxton being the inventors and Paxton Machines, Inc., being the owner. The basic claim allowed was for a V-shaped device which restricted the opening of the bag sufficiently to allow the attachment of the single lok. On December 14, 1960, Paxton Machines, Inc., assigned Patent No. 2,705,100 to Kwik-Lok Yakima. When Kwik-Lok Yakima was organized in 1954, one of its corporate purposes was the manufacturing of bag-closing devices. When in 1960 a subsidiary, Kwik-Lok Indiana, was organized, its corporate purposes included manufacturing and distributing the company's product in the eastern part of the United States. In the early 1960's, the Kwik-Lok corporations were selling primarily the unpatented single loks and hand-applied single loks with labels. The single loks were of two types: "Series A closures" which were plain single loks; and "Series B closures" which bore *300 printed prices or other limited items of information. The single loks with labels consisted of single loks to which larger pieces of tagboard or cardboard had been glued; they also functioned as bag labels. In the early 1960's, the hand-operated machine covered by U.S. Patent No. 2,705,100 and manufactured by Kwik-Lok Yakima was designated the Type 100A machine. The Type 100A machine was semi-automatic in that, in order to apply single loks to the plastic bags, an operator was needed to insert bags manually into the machine. The Type 100A machine could apply single loks but not single loks with labels. Under optimum conditions, an operator could apply approximately twenty-five single loks per minute using the Type 100A machine. The Type 100A machine was not a significant financial success because of mechanical difficulties. Five hundred of the single loks which it applied were put on a strand and placed into a hopper or magazine on the machine. Single loks were fed out from the magazine under a gate as each lok was being applied to a bag. This arrangement rendered the Type 100A machine prone to jamming, either because of improper placement by the operator of the single loks in the *301 hopper or because of variations in the thickness of the plastic used for the single loks. Another reason the Type 100A machine was not a significant economic success was that its operation was limited to a semi-automatic state requiring manual insertion of bags by operators. In the early 1960's, two machines competed with the Type 100A. Both of these machines could apply more single loks per minute than the Type 100A machine. J.H. Platt Co. manufactured and sold a machine capable of automatically applying the Kwik-Lok single loks; the machine was automatic in the sense that the bags to be closed could be passed through the machine and closed without a human operator. The average speed of the J.H. Platt Co. machine was forty to forty-five single lok sapplications per minute. Continental Baking Co. manufactured for its own use a machine capable of applying single loks at a rate of forty to forty-five per minute. Neither of these two competitive machines could apply Kwik-Lok's single loks with labels. In the early 1960's, around 1962-1963, a competitor of Kwik-Lok also manufactured bag-closing devices similar to the unpatented Kwik-Lok single loks. About 1960, Dana E. Keech, (herein *302 Mr. Keech) a patent attorney whose address, in 1961, was Los Angeles, California, began handling patent work for Floyd Paxton and for the enter-prises with which Floyd Paxton was connected. Mr. Keech was born before the turn of the century. In his correspondence with Kwik-Lok Yakima or Floyd Paxton, Mr. Keech followed the general trade practice of assigning an office docket number to each invention for which he had undertaken a patent application or prosecution. During all times pertinent herein, patent lawyers in the United States customarily assigned office docket numbers or similar office coding numbers to each invention for which they had undertaken patent applications and prosecutions. Such office docket numbers were used for internal office filing purposes and also for identification of each item of correspondence or document pertaining to the particular invention. When the application or prosecution had reached a point where a U.S. application serial number had been assigned, or where a U.S. patent number had been issued for the invention by the U.S. Patent Office, the application serial number or U.S. patent number would customarily be used by the patent lawyer in addition *303 to or in lieu of the office docket number to identify all items of correspondence and documents pertaining to the invention. The patent lawyer would customarily include in correspondence or documents a descriptive name for the invention, along with other descriptive information when needed, such as date of application, the office docket number, the application serial number or patent number. In like fashion, Kwik-Lok Yakima kept a separate file folder containing all items of correspondence and documents pertaining to each patent application or patent. Each file folder was first identified on the cover by the name of the country in which the patent application was pending and also the office docket number appearing in Mr. Keech's early correspondence pertaining to the particular patent application or patent. Later, as each became known, the description of the invention, the application serial number, and the U.S. or foreign patent number were added to the cover of the appropriate file folder. On February 27, 1961, Floyd Paxton, through Mr. Keech, applied for a U.S. patent for bag closures united in strip form end-to-end (herein end-to-end striploks) and an apparatus for making the *304 same and for dispensing individual bag-closing devices. Mr. Keech gave this application office docket number K-1305. On March 7, 1961, the U.S. Patent Office assigned this application Serial No. 93,888. The application was amended on February 8, 1962, and again on September 19, 1962. On May 22, 1964, application Serial No. 93,888 was substantially amended, with-drawing all claims except the claims numbered 26, 27 and 28. On January 5, 1965, application Serial No. 93,888 was approved by the U.S. Patent Office and U.S. Patent No. 3,164,249 was issued showing Floyd Paxton as the inventor and owner. In the patent itself, after setting forth the specifications of such patent, are these words: The claims are: 1. In a multi-closure strip, wherein the closures each may have a bag confining mouth and a narrow opening located in a longitudinal side edge thereof and communicating with said mouth for admitting a bag neck into the latter; the structure comprising: a multiple of closures of transversely stiff, thin, sheet material comprising polystyrene or the like, arranged consecutively with their transverse edges in closely spaced relation; and web means integrally connecting with each *305 consecutive pair of closures in frangible areas of union located between opposite ends of said web means and said closely spaced edges of said consecutive closures, said frangible areas being spaced far enough apart length-wise of said strip and being sufficiently restricted in the cross sectional dimension thereof measured transversely of said strip, that compressive forces applied in the plane of said strip from opposite directions res-pectively to said consecutive closures and through said closures to opposite ends of said web means without causing said closures to buckle, will cause the material of said strip to substantially simultaneously crack in said frangible areas of union at the opposite ends of said web means and thus separate said web means from said closures and said closures from each other. 2. In a multi-closure strip, the structure recited in claim 1, wherein the web means integrally connecting each consecutive pair of closures in said strip comprises a pair of transversely spaced webs. 3. In a multi-closure strip, the structure recited in claim 2 wherein portions of each transverse edge of a closure, lying immediately adjacent to and on opposite sides of the area *306 of union between said edge and one of said webs, are transversely aligned and form right angles with said web. 4. In a multi-closure strip, the structure recited in claim 2, wherein the length of each of said webs, which is the distance measured lengthwise of said strip between said areas of union at the ends of said web, is substantially greater than the width of one of said areas of union which is the dimension thereof measured transversely of said strip. 5. In a multi-closure strip, the structure recited in claim 4, wherein said width of said area of union at each end of each web is approximately.039 inch, the length of said web is approximately.0625 inch and the thickness of said strip is approximately.032 inch. In early 1962, Floyd Paxton, through Mr. Keech, resubmitted an application for a U.S. patent for a method and apparatus for making bag closures united in strip form and for dispensing individual bag closures, based upon claims withdrawn from application Serial No. 93,888. Mr. Keech gave this application office docket number K-1339. The application was assigned application Serial No. 184,472 by the U.S. Patent Office. The application was amended December 11, 1963. *307 On January 5, 1965, application Serial No. 184,472 was granted and U.S. Patent No. 3,163,970 was issued showing Floyd Paxton as the inventor and owner. In November 1963, Floyd Paxton, through Mr. Keech, applied for a U.S. patent for a multi-closure strip (united side-to-side) (herein side-to-side striploks). Mr. Keech gave this application office docket number K-1426. This application was assigned application Serial No. 325,665 by the U.S. Patent Office. This application was amended on July 7, 1964 and October 1, 1964. On January 5, 1965, application Serial No. 325,665 was granted and U.S. Patent No. 3,164,250 was issued showing Floyd Paxton as the inventor and owner. In the patent itself, after setting forth the specifications of such patent, are these words: What is claimed is: 1. A matrix in strip form for consecutively producing a series of bag closures comprisong a strip of relatively thin and stiff but springy flat sheet plastic material, said strip being weakened at regularly spaced longitudinal intervals along a transverse line normal to the side edges of said strip by means eliminating the material of said strip bordering said transverse line, with the exclusion of *308 a pair of narrow webs located on said line, said means including a hole bordering said line and having opposite extremities located on said line, said webs being readily frangible upon the imposition of a moderate amount of traction to said strip on opposite sides of said line to separate said strip along said line, said strip having, adjacent each of said holes, an internal aperture which communicates with said hole through a narrow passageway, whereby the separation of said strip along a given line as aforesaid, converts the portion of said strip adjacent said line having said aperture into a bag closure. 2. A matrix in strip form for consecutively producing a series of bag closures as recited in claim 1, wherein said strip is coiled in such a direction that when said strip is separated along any of said transverse lines as aforesaid, as said strip is being unwound from said strip coil a closure is formed as aforesaid on the part of said strip remaining on said coil. 3. A strip of relatively thin and stiff but springy flat sheet plastic material, said strip being weakened at regularly spaced longitudinal intervals along a transverse line normal to the side edges of said strip *309 by a hole bordering said transverse line and having opposite extremities located on said line, and by two notches, one in each of said side edges, with the apices of said notches lying in said line and spaced respectively from said extremities by two narrow webs of unbroken sheet plastic, which webs are readily frangible upon the imposition of a moderate amount of traction to said strip on opposite sides of said line to separate said strip along said line, said strip having adjacent each of said holes an internal aperture which communicates with said hole through a narrow passage, whereby the separation of said strip along a given line as aforesaid converts the portion of said strip adjacent said line having said aperture into a bag closure. The critical invention in both U.S. Patent Nos. 3,164,249 and 3,164,250 related to a particular and specific means for joining bag-closure devices in strip form. In particular, the critical feature of the claims in the two patents was the means by which the individual closures were joined together--the "web means." The file wrapper histories of the two patents show that originally the applicant asserted claims that were broad in nature and were *310 not limited specifically to the use of web means. However, the patent examiner indicated that claims of the breadth contained in the original applications could not be allowed in light of prior art. [3] In response, the applicant substituted narrower claims that focused specifically on web means as the solution to the problem of joining bag-closing devices together in a strip form such that they could be coiled without accidentally parting, and yet could be applied and parted by the application of longitudinal force. Thereafter, the patent examiner allowed the claims as narrowed. U.S. Patent Nos. 3,164,249 and 3,164,250, pertaining to the side-to-side and end-to-end striploks, allowed essentially three elements in the claims for each of the two closure devices. The three elements related to: (1) the stiffness of the closure device material; (2) the location and shape of the bag opening; and (3) the frangible (easily breakable) web attachments, or web means, for interconnecting the closure devices. In February 1965, Floyd Paxton directed Mr. Keech to prepare applications for patents on two label-bearing closures in strip form (herein closures with *311 labels), in the name of Floyd Paxton, as owner and inventor, without assignment to anyone including Kwik-Lok Yakima. This direction by Floyd Paxton conformed with the practice followed at Kwik-Lok Yakima with regard to patent applications. If applications covered inventions by employees of Kwik-Lok Yakima other than Floyd Paxton or inventions by employees of Kwik-Lok Yakima in collaboration with Floyd Paxton, the inventions were assigned by the inventors to Kwik-Lok Yakima at the times patent applications were made, and patents were issued on that basis. For example, this practice was followed with regard to both U.S. Patent No. 3,163,969 (relating to bag-closing devices invented by Allen D. Paxton, Floyd Paxton, and Jere Irwin, the husband of Diane Irwin) and U.S. Patent No. 3,163,972 (relating to bag-closing devices invented by Jere Irwin). If applications covered inventions made by Floyd Paxton alone, the applications were made in the name of Floyd Paxton as inventor and owner (without assignment) and patents subsequently issued showed the same. On April 15, 1965, Floyd Paxton, through Mr. Keech, applied for a patent covering a multi-closure label-bearing strip (herein side-to-side *312 closures with labels). Mr. Keech gave this application office docket number K-1629. The application was received by the U.S. Patent Office on April 20, 1965, and was assigned application Serial No. 449,574. The application was later amended on March 28, 1966. Also on April 15, 1965, Floyd Paxton, through Mr. Keech, applied for a patent covering bag closures and individually attached labels united in strip form (herein end-to-end closures with labels). Mr. Keech gave this application office docket number K-1628. This application was received by the U.S. Patent Office on April 20, 1965, and was assigned application Serial No. 449,575. On September 6, 1966, application Serial No. 449,574 was granted and Patent No. 3,270,872, showing Floyd Paxton as inventor and owner, was issued. Also, on September 6, 1966, application Serial No. 449,575 was granted and Patent No. 3,270,873, showing Floyd Paxton as inventor and owner, was issued. The basic invention in the claims allowed by the U.S. Patent Office in both U.S. Patent Nos. 3,270,872 and 3,270,873 related to a means of attaching labels in a feathered fashion to bag-closing devices united in strip form in such a way that the strips *313 with labels attached could be coiled, stored, and thereafter applied without any interference in the application process due to the presence of the attached large labels. The attachment of labels to striploks covered, respectively, by U.S. Patent Nos. 3,164,250 and 3,164,249 are examples of embodiments of the inventions covered by U.S. Patent Nos. 3,270,872 and 3,270,873. However, the claims of U.S. Patent Nos. 3,270,872 and 3,270,873 were not limited to the application of labels to striploks. The claims of the patents covering end-to-end and side-to-side closures with labels did not depend on the particular means of connecting bag-closure devices in strip form, were not limited by the particular web means claimed under U.S. Patent Nos. 3,164,249 and 3,164,250, and could be readily practiced on strips of bag-closure devices other than those claimed under U.S. Patent Nos. 3,164,249 and 3,164,250. The claims of U.S. Patent Nos. 3,270,872 and 3,270,873 do not coact with or improve any of the essential elements (closure stiffness, bag-grasping opening, and web means of attachment) of the claims of, or address any of the problems discussed in, U.S. Patent Nos. 3,167,249 and 3,167,250. *314 The inventions covered by U.S. Patent Nos. 3,270,872 and 3,270,873 are not embraced by any of the claims allowed in each of U.S. Patent Nos. 3,164,250 and 3,164,249. On July 1, 1965 and May 1, 1966, Mr. Keech billed Floyd Paxton, c/o Kwik-Lok Yakima, $850 and $283, respectively, for legal services rendered in connection with obtaining U.S. Patent Nos. 3,270,872 and 3,270,873. Sometime prior to September 27, 1968, Kwik-Lok Yakima paid such bills. On that date, Kwik-Lok Yakima billed Floyd Paxton for such expenses, and on September 30, 1968, Floyd Paxton personally reimbursed the corporation for such expenses. On April 30, 1965, Floyd Paxton, as owner, and Kwik-Lok Yakima, as licensee, executed a License Agreement authorizing Kwik-Lok Yakima to exploit Patent Nos. 3,163,970, 3,164,249 and 3,164,250 for a period ending on January 5, 1982. The license was to run for the life of the patent (until January 5, 1982), with royalties being paid as follows: ROYALTY. During the term of this agreement, LICENSEE shall pay LICENSOR cash royalties as follows: 7-1/2% (seven one-half per cent) on the first $1,000,000.00 (one million dollars) of net sales by LICENSEE and its Sublicensees of devices *315 covered by one or more of said patents during each calendar year, the first of which years is to start on May 1, 1965, and conclude April 30, 1966. 6% (six per cent) on the second $1,000,000.00 (one million dollars) of such net sales during said calendar year. 5% (five per cent) on all such net sales in excess of $2,000,000.00 (two million dollars) during said calendar year. Said royalties shall be assessed upon the gross monies paid to and received by LICENSEE and its Sublicensees by their customers and distributors in purchasing said devices, after deducting from said gross monies amounts collected to cover sales, use and excise taxes and transportation charges. The performance by LICENSEE and its Sublicensees of said patented methods shall be free from the payment of royalties. On the same day, Kwik-Lok Yakima, as primary licensee under the License Agreement executed on April 30, 1965, executed a Sublicense Agreement with Kwik-Lok Indiana for the exploitation of U.S. Patent Nos. 3,163,970, 3,164,249 and 3,164,250. The term of the sublicense extended to January 5, 1982. The term and royalty provisions of the Sublicense Agreement were identical to those of the License Agreement. *316 Mr. Keech drafted both the License and Sublicense Agreements executed on April 30, 1965. In the License Agreement, Mr. Keech described and identified specifically three patents to be licensed for exploitation, i.e., U.S. Patent Nos. 3,164,249, 3,164,250 and 3,163,970. In the agreement as drafted, Floyd Paxton, as inventor and owner, also licensed Kwik-Lok Yakima to exploit: * * * all improvements heretofore or hereafter invented by LICENSOR and embraced by any of the claims of said patents. The words "said patents" referred to the three U.S. patents described specifically above. The agreements did not otherwise specifically describe, identify or refer to any inventions other than U.S. Patent Nos. 3,164,249, 3,164,250 and 3,163,970. Similarly, the Sublicense Agreement granted Kwik-Lok Indiana the non-exclusive right to exploit such patents and "devices covered by said patents including devices embodying any improvements invented by Floyd G. Paxton and embraced by the claims of said patents." During all times pertinent herein, it was a well-established trade practice for patent lawyers to describe and identify inventions with specificity in legal instruments licensing the right *317 to exploit, assigning or otherwise affecting property rights in the invention. If no patent number or application serial number for a particular invention existed, the instrument would be drafted by the patent lawyer so as to identify the invention by description, date of application for the patent, internal office docket number where applicable, or other specific reference. This trade practice was followed whenever it was possible to identify specifically any invention for which a patent prosecution had been commenced. On April 30, 1965, Mr. Keech had specific means to describe and identify Floyd Paxton's two inventions covering closures with labels, later covered by U.S. Patent Nos. 3,270,872 and 3,270,873. These inventions could have been identified by office docket numbers, dates of patent application, application serial numbers or language descriptive of the invention involved. If Floyd Paxton had specifically instructed Mr. Keech to include in the April 30, 1965, License Agreement between Floyd Paxton and Kwik-Lok Yakima a right to exploit Floyd Paxton's inventions of the means of attaching labels to closures (the end-to end and side-to-side closures with labels) for which *318 patent application had been made by Mr. Keech, then the normal practice of a patent attorney in Mr. Keech's position would have been to include in the License Agreement positive and specific reference to the two inventions, including, but not limited to, the following: (1) the titles or descriptions of the inventions for closures with lables; (2) the dates on which applications for patents on the inventions were signed; (3) the application serial numbers and the filing dates with the U.S. Patent Office; (4) if the application serial numbers were unknown, a description using the filing date and leaving blanks for the application serial numbers to be filled in at a later date; and/or (5) the office docket numbers K-1628 and K-1629. The intention of the parties to the April 30, 1965, License and Sublicense Agreements was not to include, and was to exclude, the inventions relating to end-to-end and side-to-side closures with labels to which applications Serial Nos. 449,574 and 449,575 had been assigned. Neither Kwik-Lok Yakima nor Kwik-Lok Indiana acquired any right to exploit the inventions described in U.S. Patent Nos. 3,270,872 and 3,270,873 (the end-to-end and side-to-side closures *319 with labels) by reason of the License Agreement and the Sublicense Agreement executed on April 30, 1965. During the years 1965 through 1971, in accordance with the April 30, 1965, License Agreement, Kwik-Lok Yakima paid Floyd Paxton the following amounts of royalties: Year
Amount
1965
$38,018.33
1966
96,154.48
1967
131,303.85
1968
125,577.60
1969
100,480.87
1970
118,388.62
1971
134,000.32
Among the products sold which generated some of these royalties during the period from September 6, 1966 (the date the closure-with-label patents were granted), to February 21, 1969 (the date the closure-with-label patents were transferred to Kwik-Lok Yakima and licensed to Kwik-Lok Indiana), were some closures with labels attached using the process patented in U.S. Patent Nos. 3,270,872 and 3,270,873. During such period, no sales or licensing agreements were executed in connection with the use by the Kwik-Lok corporations of such patented process. In accordance with the April 30, 1965, Sublicense Agreement, Kwik-Lok Indiana accrued, and later paid to Kwik-Lok Yakima, the following amounts in the following fiscal years ended March 31: Year
Amount
1966
$30,133.74
1967
65,381.95
1968
89,005.57
1969
87,646.74
1970
76,308.57
1971
87,411.02
1972
91,781.16
Following *320 an earlier income tax audit of Floyd Paxton and Grace Paxton, an agreement was reached with the Commissioner that amounts received by Floyd and Grace Paxton under the April 30, 1965, License Agreement were taxable as receipts from the sale of Patent Nos. 3,164,249 and 3,164,250. The tax treatment of these amounts is not in issue in these docketed cases. On July 12, 1968, Floyd Paxton assigned U.S. Patent Nos. 3,270,872 and 3,270,873 to IDT. The assignment was recorded with the U.S. Patent Office on April 10, 1969, after which date IDT was shown as the assignee and owner of the patents. On February 21, 1969, IDT executed a Purchase Agreement relating to Patent Nos. 3,270,872 and 3,270,873 conveying them to Kwik-Lok Yakima for $5,000,000, payable without interest in 172 monthly installments of $28,901 each, commencing April 5, 1969, plus a final payment of $29,028, due August 5, 1983. On July 23, 1970, the February 21, 1969, Purchase Agreement was amended to provide that the monthly payments by Kwik-Lok Yakima to IDT would include 4 percent simple interest on the lesser unpaid balances resulting from the inclusion of interest. On February 21, 1969, Kwik-Lok Yakima executed a License *321 Agreement granting to Kwik-Lok Indiana an exclusive license, covering the District of Columbia and 36 eastern states, to exploit Patent Nos. 3,270,872 and 3,270,873. The consideration which Kwik-Lok Indiana agreed to pay for the license was $3,350,000 payable without interest in 172 monthly installments of $19,365 each, commencing April 5, 1969, plus a final payment of $19,220, due on August 5, 1983. On July 2, 1970, the License Agreement executed on February 21, 1969, by Kwik-Lok Yakima and Kwik-Lok Indiana was amended to provide for a revised schedule of payments by Kwik-Lok Indiana to Kwik-Lok Yakima for the right to exploit U.S. Patent Nos. 3,270,872 and 3,270,873. In accordance with the terms of the February 21, 1969, License Agreement, as amended on July 2, 1970, Kwik-Lok Indiana paid Kwik-Lok Yakima the following sums in its fiscal years ended March 31: Year
Amount
1970
$230,640
1971
265,747
1972
277,450
Under the terms of the February 21, 1969, Purchase Agreement by which Kwik-Lok Yakima acquired U.S. Patent Nos. 3,270,872 and 3,270,873, Kwik-Lok Yakima paid to IDT on the following dates the following amounts in payment of the purchase price: Date
Amount
9/ 8/69
$57,802
11/10/69
86,703
12/19/69
115,604
3/30/70
86,703
6/ 1/70
86,703
10/20/70
86,703
11/ 3/70
86,703
3/26/71
86,703
8/19/71
173,406
10/11/71
28,901
11/12/71
28,901
12/12/71
28,901
Kwik-Lok *322 Yakima claimed the following amounts as amortization of the cost of U.S. Patent Nos. 3,270,872 and 3,270,873 in the fiscal years ended March 31: Year
Amount
1970
$231,208
1971
346,821
1972
346,821
The side-to-side striploks covered by U.S. Patent No. 3,164,250 were applied by a machine, manufactured by Kwik-Lok Yakima, which was first called the Model 108.1 and later the Model 1081. The Model 108.1 was the first significant and notable improvement in the Kwik-Lok product line over the Type 100A machine which applied single loks. The Model 108.1 was introduced in late 1962. The Mode 108.1 could apply side-to-side striploks automatically at speeds of up to 120 per minute. It could not apply the unpatented single loks, single loks with labels, or closures with labels (either end-to-end or side-to-side). With the introduction of the Model 108.1 Kwik-Lok continued to sell the semi-automatic Type 100A machine for a year or two. Continental Bakeries, however, ceased to manufacture its machine competitive with the Type 100A machine. Also, although J.H. Platt Co. still carried a machine competitive with the Type 100A machine, the J. H. Platt machine sold poorly because of the superiority of the *323 Model 108.1. Around 1965, Kwik-Lok Yakima introduced and marketed a machine designated as the Model 100.2. The Model 100.2 applied the end-to-end striploks covered by U.S. Patent No. 3,164,249. The Model 100.2 was semi-automatic in that an operator was required to insert the bags in the machine. Under optimum conditions, the Model 100.2 could apply 25 to 30 end-to-end striploks per minute with one operator. The Model 100.2 could not apply single loks with labels or closures with labels (either end-to-end or side-to-side). In late 1965 or 1966, Kwik-Lok Yakima introduced and marketed a machine first designated as the Model 108.4 machine and later named the Model 1084 machine. The Model 108.4 could apply either side-to-side closures with labels covered by U.S. Patent No. 3,270,872 or side-to-side striploks covered by U.S. Patent No. 3,164,250. The Model 108.4 was fully automatic and could apply the side-to-side closures with labels at speeds up to 120 per minute. In 1967-1968, Kwik-Lok Yakima introduced and marketed a machine later designated as the Model 1006 machine, which could apply end-to-end closures with labels covered by U.S. Patent No. 3,270,873 as well as the end-to-end *324 striploks covered by U.S. Patent No. 3,164,249. The Model 1006 was semi-automatic in that an operator was required. It could apply bag closures at speeds of up to thirty per minute. Kwik-Lok Yakima usually sold a machine designated as the Model 1082 bag tensioner along with the Model 1081 and 1084 machines. The bag tensioner is a device which flattens out the plastic bag just prior to the entry of the bag into the bag-closing head of the Model 1081 and 1084 machines. Kwik-Lok Yakima also sold a conveyor which conveyed the packaged product past the Model 1082 bag tensioner, into the bag-closing machine, and onto a take-off conveyor. The primary function of the striploks covered by U.S. Patent Nos. 3,164,249 and 3,164,250 was to close bags. The function of the closures with labels (end-to-end and side-to-side) covered by U.S. Patent Nos. 3,270,872 and 3,270,873 went beyond the physical act of closing a flexible bag and encompassed the sales, marketing, advertising, and promotion of the packaged product or of other products. Prior to the advent closures with labels, the Kwik-Lok Yakima sales department had primarily approached the production and engineering personnel of its customers. *325 Because the function of closures with labels included marketing the packaged product or other products, Kwik-Lok Yakima began approaching its customers' marketing personnel as well. This change necessitated the hiring by Kwik-Lok Yakima of salespersons who could handle and present sales and marketing concepts rather than simply salespersons competent only to promote the bag-closing concept. To promote the marketing function of the closures with labels, Kwik-Lok Yakima designed different special label programs. For example, for the Christmas season, Kwik-Lok offered various labels with different Christmas scenes or greetings as well as labels which had cut-out line drawings of ornaments for children to color and use as Christmas tree ornaments. Also, Kwik-Lok Yakima developed, among other programs, a Valentine program, a program called "Men of the West" depicting in different labels "good guys" and "bad guys," a program called "Historic Moments in U.S. History" depicting the same, and a program called the "Funny Farm" depicting various cartoon characters. Kwik-Lok Yakima also offered animated cartoons for use in television advertising as a backup to the various label programs. *326 In October 1967, for the first time in its history, Kwik-Lok Yakima joined the Bakers Exposition in Atlantic City to promote and sell the Model 108.4 machine and the closures with labels. At this Exposition, Kwik-Lok Yakima also marketed some special label programs such as the Christmas label programs. The exposition was helpful to Kwik-Lok Yakima in its effort to further penetrate the bakery market. The success also served to show Kwik-Lok Yakima the important appeal of the marketing function of the closure-label strips. Kwik-Lok Yakima's closures with labels also afforded packaging customers the capacity of cross-advertising, a technique by which a product different from the one sold is promoted to consumers who purchased the product packaged, or of "couponing," in which a coupon can be incorporated in or attached to the label. The closures with labels (end-to-end and side-to-side) could be designed to meet the specific sales and marketing needs of the packaging customer. The labels could give brand identification, capitalize on fad promotions, capture seasonal markets such as Christmas, Valentine's Day, or Halloween, promote special events, cross-advertise, advertise contests, *327 attract sports fans with sports labels, function as coupons, introduce new products, and meet many other sales, marketing, advertising and promotional needs of Kwik-Lok Yakima's customers.
During the pertinent periods herein, the actual and potential marketing function of closures with labels possibly enhanced the sale of the Kwik-Lok corporations' entire line of products, including closures with labels, striploks and the machines capable of applying and needed to apply both closures with labels and striploks. Their sales presentation, which emphasized the marketing, sales and promotional capabilities of the closures with labels, was expected to, and did in fact, induce some customers to choose Kwik-Lok's bag-closing system over other bag-closing machines or systems because of the customers' potential desire to use closures with labels for sales and marketing purposes, and, when not using labels, to be able to apply striploks automatically with the same machinery. In early 1969, prior to Kwik-Lok Yakima's purchase of U.S. Patent Nos. 3,270,872 and 3,270,873, it expected its possession of the right to manufacture and sell closures with labels (end-to-end and side-to-side) to increase *328 the sales of Kwik-Lok Yakima's entire product line, including bag-closing machinery and striploks. The following chart indicates the combined sales experience of Kwik-Lok Yakima and Kwik-Lok Indiana during the years ending March 31, 1967, 1968, and 1969: Striploks
Closures with
Covered by
Labels covered by
Single Loks and
U.S. Patent Nos.
U.S. Patent Nos.
Fiscal Year
Single Locks with
3,164,250 &
3,270,872 &
Ended
Labels
3,164,249
3,270,873
3/31/67
$524,760.33
$1,475,496.54
$30,021.07
3/31/68
475,851.01
1,772,917.90
149,278.54
3/31/69
424,788.76
1,409,003.68
141,609.50
Other Automatic
Total Gross Sales
Semi-Automatic
Bag-Closing
for All Products
Fiscal Year
Type 100.2 Bag-
Machines Sold by
(including items
Ended
Closing Machine
Kwik-Lok Yakima
not listed here)
3/31/67
$25,577.46
$503,814.10
$2,561,327.07
3/31/68
18,421.11
324,399.29
2,742,822.07
3/31/69
18,761.73
414,796.90
2,515,765.44
In early 1969 Kwik-Lok Yakima experienced an approximate 50 percent gross profit on sales of its bag-closing machines, bag tensioners, conveyor belts, and other machines. The five most common commercial means of plastic bag closing in the flexible packaging industry were the following: heat seal, staples, tape, wire ties, and Kwik-Lok bag-closing devices. *329 Each of these means had one or more of the following qualities or capabilities which were commercially significant: reusability, semi-automatic application, fully automatic application, labeling capability with semi-automatic application, labeling capability with fully automatic application, metal detection compatibility, and pricing and coding capability. Metal detection compatibility is the capability of the bag-closing device to avoid triggering metal detection devices used in some food industry production lines to prevent the presence or introduction of metal into the food products being packaged. The following chart indicates the qualities or capabilities possessed by each of the five most common commercial means of plastic bag closing: Means of Plastic Bag Closing
Kwik-Lok
Bag-Closing
Qualities or Capabilities
Heat Seal
Staples
Wire Ties
Tape
Devices
Reusability
x
x
Semi-automatic application
x
x
x
x
x
Fully automatic application
x
x
x
x
x
Labeling capability with
semi-automatic application
* L
x
Labeling capability with
fully automatic application
x
Metal detection compatability
x
x
x
Pricing and coding capability
* L
x
x
Only Kwik-Lok bag-closing devices had all the commercially significant *330 qualities or capabilities. In early 1969, the closures with labels (end-to-end and side-to-side) covered by U.S. Patent Nos, 3,270,872 and 3,270,873 held a very strong competitive position in the bag-closing device market, a highly competitive market. This was also true of the Kwik-Lok equipment needed to apply the closures with labels in fully automatic fashion. In fact, the only competitimve product (i.e., wire ties) had limited semi-automatic labeling capability and was believed to be a "sitting duck" for the Kwik-Lok corporations' by Jerre Paxton, the president of Kwik-Lok Yakima. In early 1969, prior to Kwik-Lok Yakima's purchase of U.S. Patent Nos. 3,270,872 and 3,270,873 it had a sales organization and production staff sufficient to effectively exploit the two closure-with-label patents and to establish a market position which would enable it to take full advantage of these inventions during the after the life of the patents. Prior to the acquisition of the patents, Kwik-Lok Yakima had machines capable of manufacturing the closures with labels, plant capacity to manufacture the product, means to promote and market the product, and machines which it could sell which were *331 capable of automatically applying the closures with labels. Kwik-Lok Yakima fully expected to be able to continue to sell the closures with labels, and the related machinery, after expiration of the patents, and to take advantage of the market dominance which it expected to acquire during the lives of the patents. In early 1969, prior to Kwik-Lok Yakima's purchase of U.S. Patent Nos. 3,270,872 and 3,270,873, it expected continued growth in the flexible packaging industry, and continued and increasing demand for plastic bag-closing devices. The production of polyethylene film (used for plastic bags) in the United States had increased from 183 million pounds in 1958 to 615 million pounds in 1965 and was expected to increase to 720 million pounds in 1968. Prior to Kwik-Lok Yakima's purchase of U.S. Patent Nos. 3,270,872 and 3,270,873 in early 1969, it expected the sales price per thousand of the closures with labels to be at least four times the sales price per thousand of the striploks. Further, Kwik-Lok expected the sales of the closures with labels to equal or exceed, quantitatively speaking, the prior sales of striploks. The following two charts set forth the approximate selling *332 prices, costs, and gross profits experienced in early 1969 by Kwik-Lok Yakima with respect to striploks and closures with labels. As shown, the total production costs of the closures with labels approximated 29.4 percent of their gross sales price. STRIPLOKS
($ per thousand) Selling Price:
$0.950
Production Costs: Plastic Material for Loks
.300
Slitting Labor
.005
Packaging
.010
Production Machine Labor
.035
Total Costs
$0.350
Gross Profits (selling price less costs):
$0.600
Percentage Gross Profit Margin of Selling Price: 63.2 percent Percentage Total Production Costs of Selling Price: 36.8 percent CLOSURES WITH LABELS
($ per thousand) Selling Price:
$4.500
Production Costs: Plastic Material for Loks
.300
Slitting Labor
.005
Packaging
.030
Production Machine Labor
.140
Label
.700
Card Cutting
.150
Total Costs
$1.325
Gross Profits (selling price less costs):
$3.175
Percentage Gross Profit Margin of Selling Price: 70.6 percent Percentage Total Production Costs of Selling Price: 29.4 percent In early 1969, prior to Kwik-Lok Yakima's purchase of U.S. Patent Nos. 3,270,872 and 3,270,873, it believed that the closures with labels would be marketable in the future in two possible new markets: the chicken-tagging industry *333 and the net bag industry. Kwik-Lok Yakima based its appraisal (in early 1969) of the value of U.S. Patent Nos. 3,270,872 and 3,270,873 on the in-house expertise of its employees who had a good knowledge of the pastic bag-closing business. Furthermore, in early 1969 Jerre Paxton, as president of Kwik-Lok Yakima, did not think that any independent researcher knew as much about the corporation's business as he did; Kwik-Lok Yakima did not, therefore, use any independent marketing research organization to product a study to determine a purchase price for the two patents. Based upon the Inwood Method [4] of ascertaining present value, and using a 15 percent interest rate, the payments which the February 21, 1976, Purchase Agreement required Kwik-Lok Yakima to make to IDT in exchange for U.S. Patent Nos. 3,270,872 and 3,270,873 had a discounted present value on February 21, 1969, of $2,006,480. The terms of the Purchase Agreement dated February 21, 1969, between IDT and Kwik-Lok Yakima conveying U.S. Patent Nos. 3,270,872 and 3,270,873 were reasonable in light of the history set forth above *334 and the expectations which Kwik-Lok Yakima reasonable held at that time. On February 1, 1979, Kwik-Lok Yakima properly filed for its fiscal years ended March 31, 1970, 1971 and 1972, effective elections pursuant to section 243(b), Internal Revenue Code of 1954, [5] to treat dividends received by it from affiliated corporations as qualifying dividends. Grantor Trust Issues
On August 3, 1967, Floyd Paxton, as grantor, and Lorne House and Jerre Paxton, as trustees, executed a Declaration of Trust creating PFT. The Declaration of Trust is reproduced below. DECLARATION OF TRUST OF THIS CONSTITUTIONAL TRUST TO BE ADMINISTERED BY NATURAL PERSONS, HOLDING TITLE IN JOINT TENANCY, ACTING UNDER THEIR CONSTITUTIONAL RIGHTS AS CITIZENS OF THE UNITED STATES OF AMERICA
THIS DECLARATION OF TRUST AUTHORIZES ITS TRUSTEES TO OPERATE UNDER THE NAME OF F.G. PAXTON FAMILY ORGANIZATION THIS AGREEMENT, CONVEYANCE and ACCEPTANCE, made and entered into at the time and on the date appearing in the acknowledgment hereto attached, by and between FLOYD G. PAXTON, GRANTOR and CREATOR hereof, LORNE HOUSE and JERRE PAXTON, ACCEPTORS hereof *335 in joint tenancy who shall compose the Board of Trustees and Executive Officers for conducting said business. THIS INDENTURE OF TRUST, made the 3rd day of August, 1967, by and between the one or more persons subscribing this agreement, parties of the first part, and Jerre H. Paxton and Lorne House, (hereinafter called the "Trustees"), parties of the second part, WITNESSETH
WHEREAS, the Subscribers are deeply involved in the complex economic social and cultural affairs of the world of today and are aware of the many uncertainties that exist in this changing world and of their responsibilities to friends, relatives, employees, charitable institutions, governmental service organizations and the people of their municipalities states and nation and have determined that this Trust is an instrument designed to best meet said responsibilities for the benefit of all. WHEREAS, the Subscribers intend that the functions of this Trust shall therefore to be manage and operate as effectively as possible all properties with which the Trustees may from time to time be vested so as to maximize the economic potential thereof for the good of all and to provide employment at the economic level required *336 by the standard of living of this culture as it may from time to time for all employees engaged in the operation of such properties and all persons interested in such operations and the results thereof and from the gross revenues of such operations, to the extent not required for expenditure as aforesaid, to make grants and donations to education, scientific and religious institutions for and in the name of the Trust, and, if the Trustees in their sole discretion so determine, to make distributions from the net revenues of such operations to the account of and in the name of the Holders of Certificates of Interest. WHEREAS, the Trustees have consented to act as such hereunder on the terms and conditions hereinabove and hereinafter set forth: NOW, THEREFORE, in consideration of the premises and of the objects and purposes hereinabove and hereinafter set forth and of the sum of One Dollar ($1.00) in hand paid and other considerations of value, the receipt whereof is hereby acknowledged, the Subscribers and the Trustees, each acting severally and not jointly, have and do hereby agree as follows: FIRST: The name of this Trust and other things of value constituting the Trust Estate, including *337 all rights in reversion, remainder, expectancies or inheritances, wherever situated and other things of value too numerous to mention, shall be held, administered and disposed of in accordance with and pursuant to the provisions of this indenture. SECOND: The principal place of business of this Trust shall be in the City of Yakima, County of Yakima, State of Washington, and is to be governed in all respects by the laws of the State of Washington. THIRD: The Trustees, for themselves and their successors in trust, will accept the conveyance and assignment in trust of all of the property to be sold, assigned, granted, conveyed, transferred and set over to the Trustees described in Schedule "A" hereto annexed, all of which property, together with any and all other property and all business projects and operations from time to time held by the Trustees is herein after referred to as the "Trust Estate," upon trust for the uses and purposes hereinabove and hereinafter set forth, said Trustees to hold legal title in joint tenancy with right of survivorship, and not as tenants in common, to those certain properties, business projects and operations constituting from time to time the Trust *338 Estate and in connection therewith said Trustees shall collectively act by virtue of the convenants herein contained as a board of Trustees under the name herein designated in respect to the Trust Estate and in connection therewith may deal in properties, business projects, operations underway or contemplated, equities, formulae, entities, parents, copyrights, business goodwill and any and all other business desired to be engaged in by said Trustees in connection with the Trust Estate. The Trustees further agree to the continuing operations of such property and accept all of the terms of the Trust set forth herein and the Trustees do hereby agree to conserve and improve the Trust, to continue the operations of the property constituting the Trust Estate as if such property had not been parted with by the Subscribers in consideration for Certificates of Interest as contemplated by FOURTH hereof, to protect and preserve the assets constituting the Trust Estate, to invest and reinvest the funds of said Trust Estate in the exercise of their best judgment and discretion, to make distribution of portions of the proceeds and income under the Trust Estate as in their discretion and according *339 to the minutes to be maintained by the Trustees should be made, to make complete periodic reports as to the operations of the Trust and business transactions of the Trust and, upon final liquidation of the Trust to distribute the assets constituting the then Trust Estate in accordance with the provisions hereof, and in all other respects to administer the Trust, and the Trust Estate, in good faith strictly in conformity thereto. FOURTH: In consideration for the sale, assignment, grant, conveyance, transfer and setting over to the Trustees of the property described in Schedule "A" hereto annexed, the Trustees do simultaneously with the exception of and delivery of this indenture authorize, issue and deliver to the Subscribers units reflected by Certificates of Interest to evidence the equitable interest contributing to the Trust Estate, said units reflected by Certificates of Interest being 5,000 in number and said Certificates of Interest being substantially in form hereto attached as Annex I. Said Certificates of Interest shall be nonassessable, nontaxable and negotiable and shall pass by delivery unless registered with the Secretary of the Board of Trustees and such registration *340 noted upon any such Certificate of Interest so registered, after which no valid transfer may be made, until released from such registration by registered transfer to bearer after which any such Certificate of Interest shall again be transferable by delivery. The Secretary of the Board of Trustees shall keep as the office of the Trust books and other facilities for the registration and transfer of Certificates of Interest and upon presentation for such purpose the Secretary of the Board of Trustees shall register or cause to be registered therein and permit to be transferred thereon, under such reasonable regulations as the Secretary of the Board of Trustees may prescribe, any Certificates of Interest issued under this indenture. FIFTH: Ownership of Certificates of Interest in the Trust shall not entitle the holder thereof, whether or not registered, to any legal title in or to the Trust Estate nor to any undivided interest therein, nor any voice in the management of the Trust, nor to permit or entitle any heir or legal representative of a holder of any Certificate of Interest following his death to demand any partition or division of the property of the Trust or to any special accounting. *341 Death, insolvency or bankruptcy of any holder of a Certificate or Certificates of Interes or the transfer of any Certificate or Certificates of Interest by sale, gift, devise or descent shall not operate as a dissolution of the Trust or in any manner affect the Trust, the operation or mode of business of the Trust or the Trust Estate. The Trustees may, in their sole discretion, at any time and from time to time, make any distribution of income from the operation of the Trust Estate and make any distribution of all or any portion of the assets comprising the Trust Estate for any reason to the holders of Certificates of Interest in the Trust and, except to the extent that the Trustees have given notice of their intention to make any distribution of income or of assets comprising any portion of the Trust Estate, the holders of Certificates of Interest shall have no right, title or interest in or to any portion of the Trus Estate or of any income generated by the Trust Estate for any purpose whatsoever. SIXTH: It is hereby expressly declared that this instrument and the legal relationship constituted hereby constitutes a trust and that no partnership, association or corporation is hereby *342 created. It is hereby further expressly declared that nothing herein contained shall constitute either the (a) Trustees alone, or (b) The Trustees and the agents and representatives of the Trustees when taken together, or (c) The holders alone of Certificates of Interest present or further, or (d) The holders of Certificates of Interest, present, or future, when taken together with the Trustees and/or with the representatives and agents of the Trustees, an association or partners with any other person. It is further expressl declared that none of the Trustees, none of the agents and representative of the Trustees and none of the holders of Certificates of Interest, present or future, have or possess any beneficial interest in the propert or assets from time to time constituting all or any portion of the Trust Estate and that none of such persons shall be personally liable hereunder as partners or otherwise, and that the rights and duties of each such persons or groups of persons are several in accordance with the provisior hereof and not joint. No person acting as Trustee hereby shall be liable for the act or omission of any other person acting as Trustee hereunder or for the act *343 or omission of any other person whatsoever, whether employed by such Trustee or not, or whether employed by the Trustees as an agent or representative of the Trustees, or for anything other than his own personal breach of trust. SEVENTH: The Trustees shall have, with respect to any and all property constituting the Trust Estate, whether real, personal or mixed at any time held by them hereunder, full authority, in their absolute discretion, at any time and from time to time, to act in the management of this Trust as though the Trustees, acting as a body, where beneficial owner of the Trust Estate, including the authority (without limiting the generality of the foregoing): A. To retain any such property temporarily or permanently; or to sell or exchange or abandon the same, at public or private sale for cash or upon credit, with or without security, or upon any terms the Trustees deem proper; to grant options upon, to mortgage, or to lease the same for any period or periods whatsoever; and to operate as going concerns or businesses any and all such property and in connection therewith to manage in such manner as any natural person could any such business or operations and to buy, *344 manufacture, sell and perform services in connection therewith and otherwise deal in and with such proper as the Trustees from time to time deem fit; B. To hold, invest, or reinvest in any securities or other real or personal property (whether domestic or foreing), or undivide interest therein, including shares or interest in investment companies or investment trusts, in any common trust funds, in voting trusts certificates, royalties and other mineral rights, or in real estate or mortgages thereon, or to bid in any proper or choses in action at any foreclosure, without any duty to diversify and without regard to the proportion which any property, or property of a similar character, so held may bear to the entire amount of the Trust Estate and regardless of whether the same would in the absence of this provision constitute a legal investment for trustees or of whether the same is of a speculative nature rather than a convervative investment or of whether the same is productive or unproductive and specifically, but without limiting the generality of the foregoing, to hold, invest, or reinvest all or any part of the entire Trust Estate in common or preferred stocks and even though some *345 or all of such stocks might be considered speculative or might have no ready market and to conduct or engage in or join with others in conducting or engaging in any business, either directly or through one or more partnerships, corporations, or other forms of business organization, or through trusts, or sell or liquidate the same. In connection with the operation or carrying on of any business or other operations of all or any portion of the Trust Estate the Trustees shall have the authority to manufacture, construct, assemble, fabricate or otherwise produce, purchase or otherwise acquire, design, develop, improve, install, service maintain, repair, experiment with, hold, own, use, sell, lease, pledge, or otherwise dispose of, import, export, and trade and deal in and with, any and all goods, wares, merchandise, materials, machines, apparatus, appliances, products and property of every kind, nature and description and in connection therewith to acquire by purchase, exchange, lease or otherwise and to own, hold, develope, improve, operate, sell, assign, lease, transfer, convey, exchange, mortgage, pledge, or otherwise dispose of or encumber real and personal property of any class and *346 description and any rights and interest therein without limit as to amount and wherever situated, and, further, in connection therewith, to undertake, conduct, manage, assist, promote, engage or participate in every kind of engineering, research, scientific, experimental, design or development work and to act as consultants, operating managers, agents, or representatives of corporations, firms, individuals and others and as such to promote, manage, supervise, operate, develop or extend the business interest or properties constituting the Trust Estate and the business interests or properties of others, including corporations, firms, and individuals, and to acquire by purchase or otherwise, erect, construct, make, improve and operate, or aid in or subscribe towards the erecting, constructing, making, improving and operate, or aid in or subscribe towards the erecting, constructing, making, improving and operating of mills, factories, storehouses, buildings, roads, plants, and works of all kind and to enter into, make and perform contracts of every kind and description with any person, firm, association, corporation, municipality, county, state, body politic or government, or colony or *347 dependency thereof, and to adopt, apply for, obtain register, purchase, lease, take assignments and licenses in respect of, or otherwise acquire, and to maintain, protect, hold, own, use, enjoy, control, exercise, develop, operate, introduce, turn to account, grant licenses or other rights in respect of, sell, assign, lease, mortgage, pledge or otherwise dispose of any and all inventions, devices, formulae, processes and all improvements and modifications thereof, any and all letters patent and/or applications therefore of the United States of America or any country and all rights connected therewith or appertaining thereto, any and all copyrights granted by the United States of America or by any other country and any and all trade marks, trade names, trade symbols, goodwill and other indications of origin or ownership granted by or recognized under the laws or decisions of the United States of America or any other country, and, without in any respect limiting the generality of the foregoing, to do any and all things herein set forth to the same extent as fully as natural persons might or could do, in any part of the world, and as principal, agent, contractor, or otherwise, and either *348 alone or in conjunction with any other individuals, firms, associations, corporations, syndicates or bodies politic, including the borrowing of money without limit and upon any terms that the Trustees may determine, giving such security as the Trustees may determine and otherwise to do any and all things necessary and proper for the accomplishment of the purposes herein before set forth of this Trust or necessary or incidental to the protection and benefit of this Trust and in general to carry on any lawful business necessary or incidental to the attainment to the purposes of this Trust, whether such business is similar in nature to the enumeration hereinbefore set forth or otherwise. C. To employ such persons as the Trustees may determine to act as operational officers of the businesses and operations conducted with the property constituting all or any part of the Trust Estate and in connection therewith to employ agents, employees, accountants, brokers and investment counsel, individual or corporate, and to advise with counsel, who may be counsel for any Trustee, individually or with whom any Trustee may be associated and to employ or deal with any firm or corporation with or in *349 which any Trustee may be interested and to pay such salaries, fees, commissions, profits, benefits and allowances, directly or indirectly, in connection with any engagement as the Trustees may from time to time determine. D. To make all such grants, donations and distributions, in such amounts and when, as and if determined by the Trustees to be made, as are contemplated by the second preamable to this Declaration of Trust. EIGHTH: The Trustees shall appoint a person, who need not be one of the Trustees, to act as the Secretary of the Trustees to hold such office for such period of time and upon such terms and conditions as shall be determined by the Trustees as the time of such appointment and such Secretary shall maintain, or cause to be maintained, a permanent record of all proceedings of the Trustees. All proceedings and determinations of the Trustees shall, except as hereinafter provided, be made at meetings duly called and provided that notice of each such meeting and the time, place and purpose thereof shall be given at least two days in advance to each of the Trustees. Any Trustee may call a meeting of the Trustees upon the giving of such notice. Such notice may be waived *350 by any Trustee by written instrument execured either before or after a meeting of the Trustees. The Trustees may also take any action, without holding any meeting, by executing a written instrument signed by at least the number of Trustees whose affirmative vote is required for the proposed action and such instrument may be in counterparts respectively signed by the Trustees. The action of the majority of the whole number of the Trustees expressed from time to time at a meeting or in writing, with or without a meeting shall constitute the action of the Trustees and have the same effect as though taken by all. Any Trustee may, at any time, by an instrument of writing, appoint for a limited period of time not exceeding ninety (90) days, any other Trustee as his proxy and attorney, to perform specific duties or to exercise specified rights or to take specific action which the Trustee so appointing, would be entitled to perform, exercise or take as a Trustee. Each such proxy and power of attorney shall be revocable at any time by the Trustee executing the same, but no such revocation shall impair or affect any action taken pursuant thereto prior to such revocation. Any Trustee may *351 serve as an officer, agent or representative of the Trustees in connection with any businesses or operations carried on by the Trustees in connection with the Trust Estate. Any Trustee, or any firm or corporation of which such Trustee may be a member, director, or officer, may contract with the Trust or become pecuniarily interested in any matter or transaction to which the Trust may be a party, or in which it may in any way be concerned, as fully as though such person were not a Trustee, provided, however, that the general character and extent of such interest, if any, of any such Trustee shall be disclosed to the other Trustees upon any request therefore. No Trustee shall be removable from office by the holders of Certificates of Interest for any reason at any time whatsoever. Any Trustee may be removed from office by any court of competent jurisdiction after the exhaustion by the person so proposed to be removed of all his legal and equitable rights and remedies, including the right of appeal. Any Trustee may also be removed as such, but only for cause, upon the vote in favor of such removal of the majority of the remainder of the Trustees at the time in office at a meeting of *352 the Trustees held not sooner than thirty days following the actual delivery of notice of such proposed removal to the person so proposed to be removed as Trustee, which notice shall be accompanied by a detailed written list of particulars alleged to form the basis for the proposed removal. In the event of the removal of a Trustee or the death or resignation of a Trustee or in the case any vacancy shall be caused in the office of a Trustee for any other reason, a successor Trustee shall be selected and appointed by the remaining Trustees or Trustee, as the case may be, in office at the time. In the event that at any time there shall be only one person holding the office of Trustee, such Trustee shall designate in writing the person to be successor Trustee of the Trust in the event that such Trustee holding office shall cease to be a Trustee prior to his filling of vacancies in the office of Trustees in the manner hereinabove provided prior to the time that such person shall cease to be a Trustee. Each successor to any Trustee shall forthwith upon appointment become vested with all rights, powers, immunities and duties of his predecessor as Trustee. Notice of the selection and appointment *353 of any net Trustee or of any successor to a Trustee shall be periodically reported in accordance with the provisions of this indenture. No Trustee shall be required to give any bond or other security for the discharge of his duties as such Trustee. The initial number of Trustees shall be Two (2) but such number may be increased, or decreased, from time to time for such practical reasons beneficial to the Trust as the Trustees then in office may determine and the Trustees then in office shall fill all vacancies in the offices of Trustee caused by their action increasing the number of Trustees. The Trustees shall have and shall exercise collectively the exclusive management and control of the Trust, the Trust Estate and all business and operations constituting all or any portion of the Trust Estate. NINTH: This Trust shall continue for a period of twenty (20) years from date, unless the Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in value, or other good and sufficient reasons, liquidate the assets, distribute and close the Trust at any earlier date determined by them. The Trust shall be proportionately *354 and in a prorata manner distributed to the beneficiaries. In the event this instrument has been recorded with the Recorder of Deeds, they shall file with said Recorder a notice that the Trust shall cease and determine; and, thereupon, the Trustees shall automatically be further discharged hereunder, PROVIDED, their administration and distribution has been made in good faith, otherwise a court of competent jurisdiction may be invoked to review and correct any tort or error. TENTH: At the expiration of this Trust, or any subsequent agreement, then the Trustees, if they so desire and believe that said Trust should not be closed, may renew this agreement for a like or shorter period. A resolution of said renewal shall be entered upon the minutes (and also recorded with the County Auditor's office) at least one hundred twenty (120) days prior to the expiration hereof. IN WITNESS WHEREOF, the Grantor and Creator hereof and the Acceptors hereof, for themselves, their heirs and assigns, have hereunto set their hands and seals in token of the conveyance, delivery and acceptance of property, assets, or other things of value, and the obligations and duties as herein assumed as Trustees of *355 said Trust and assent to all stipulations herein as imposed and expressed. COUNTY OF YAKIMA STATE OF WASHINGTON ss. I, CITARLES MOOREHEAD, a Notary Public, an officer authorized by law to administer oaths, do hereby certify that FLOYD G. PAXTON, Creator, and LORNE HOUSE and JERRE PAXTON, as Trustees of the F.G. PAXTON FAMILY ORGANIZATION, a Trust, personally appeared before me this day and acknowledged that they signed, sealed and delivered the above and foregoing Trust Indenture for the uses and purposes therein set forth, and that the Trustees by their signatures evidenced the acceptance of the duties, obligations and faithful performance of said Trust Indenture. F.G. PAXTON FAMILY ORGANIZATION (A TRUST) SCHEDULE A
(INITIAL TRUST ASSETS) 1. Assets from Floyd and Grace Paxton: (a) 1,542 shares Kwick Lok Corp. , (Yakima) stock (395 shares Class A, and 1,147 shares Class B) (b) 35 shares Class A Kwik Lok Corp., (New Haven) stock (c) 5 shares Paxton Industries, Inc., stock (d) 125 shares Pacific Reserve Life Insurance Co., stock (e) 200 shares Landmark Engineering, Inc., stock (f) 20 shares Yakima Valley Turf Club, Inc., stock (g) 20 bonds, Yakima Valley Turff Club, Inc (h) Real *356 and Personal Property, North 92nd Ave., Yakima (i) U.S. Patent No. 3,067,534
(j) Note Receivable ($8,500.00). 2. From Jerre and Nancy Paxton: 222 shares Kwik Lok Corp. (Yakima) stock (53 shares Class A and 169 shares Class B) 3. From Ted and Sharon Paxton: 187 shares Kwik Lok Corp. (Yakima) stock (52 shares Class A and 135 shares Class B) 4. From Phil and Wanda Crawford: 20 shares Class B Kwik Lok Corp., (Yakima) stock Between September 20, 1967 and October 22, 1967, the following individuals transferred the assets described below to PFT: FLOYD AND GRACE PAXTON
395 shares of class A stock of Kwik-Lok Yakima 1,147 shares of class B stock of Kwik-Lok Yakima 5 shares of capital stock of Paxton Industries, Inc. 125 shares of capital stock of Pacific Reserve Life Insurance Co. 3 shares of capital stock of Kwik-Lok Indiana 200 shares of capital stock of Landmark Engineering, Inc.
20 shares of capital stock of Yakima Valley Turf Club, Inc. 20 bonds of Yakima Valley Turf Club, each in the face amount of $1,000 Real and personal property located at North 92nd Avenue, Yakima, Washington U.S. Patent No. 3,067,534
Note receivable in amount of $8,500 PHILL AND WANDA CRAWFORD
20 shares of class *357 B stock of Kwik-Lok Yakima JERRE AND NANCY PAXTON
53 shares of class A stock of Kwik-Lok Yakima 169 shares of class B stock of Kwik-Lok Yakima TED AND SHARON PAXTON
52 shares of class A stock of Kwik-Lok Yakima 135 shares of class B stock of Kwik-Lok Yakima As a result of these transfers, by October 22, 1967, PFT held all of the issued and outstanding stock of Kwik-Lok Yakima. In exchange for the transfers described above, on September 23, 1967, identical certificates of beneficial interest for units of interest were issued as follows: Number of
Percentage
Holder
Units
of Total
Floyd Paxton
2,159-1/2
43.19 Grace Paxton
2,159-1/2
43.19 Jerre Paxton
192
3.84 Nancy Paxton
192
3.84 Ted Paxton
129-1/2
2.59 Sharon Paxton
129-1/2
2.59 Phil Crawford
19
.038
Wanda Crawford
19
.038 On March 18, 1971, the certificates of beneficial interest in PFT were held as follows: Number of
Percentage
Holder
Units
of Total
Floyd Paxton
1,250-1/2
25.01 Grace Paxton
1,250-1/2
25.01 Jerre Paxton
495
9.90 Nancy Paxton
192
3.84 Ted Paxton
432.5
8.65 Sharon Paxton
129.5
2.59 Phil Crawford
19
.038
Wanda Crawford
19
.038
Floyd Paxton, Jr.
303
6.06 Ande Paxton
303
6.06 Cheryl Paxton
303
6.06 Diane Irwin
303
6.06 The trustees of PFT were as follows for the periods *358 indicated: Period
Trustees
August 1967 to
October 1967
Jerre Paxton, Lorne House
October 1967 to
September 1969
Jerre Paxton, Lorne House,
Diane Irwin, Donald Tait,
Donald Loudon
September 1969 to
November 1969
Jerre Paxton, Lorne House,
Diane Irwin, Robert Glaspey,
James Shrader
November 1969 to
end of period
here involved
Jerre Paxton, Lorne House,
Diane Irwin, James Shrader
Donald Tait and Robert Glaspey were business acquaintances of Floyd Paxton, both engaged in the publishing business in Yakima, Washington. James Shrader was a Certified Public Accountant who practiced accounting in Yaima, Washington. Neither Floyd Paxton nor Grace Paxton was ever a trustee of PFT. On August 4, 1967, Lorne House and Jerre Paxton, the original trustees of PFT, Unanimously took the following action as trustees: Jerre Paxton was appointed as First Trustee and Trust Manager to handle individually all the affairs and business of the trust estate, to make distributions of portions and proceeds and income of the trust in his sole discretion, the right to appoint his successor as First Trustee, and to preside at meetings of the Board of Trustees. No official action by the trust may be taken without his consent. On October *359 25, 1969, the trustees of PFT, upon the advice of its attorney, purported to "correct, nunc pro tunc," the trust instrument by amending paragraph NINTH to read as follows: NINTH: This Trust shall continue for a period of twenty (20) years from date, unless the Trustees shall unanimously determine upon an earlier date.The Trustees may at their discretion, because of threatened depreciation in value, or other good and sufficient reasons, liquidate the assets, distribute and close the Trust at any earlier date determined by them. Upon the dissolution of the Trust and the winding up of its affairs, the Trust Estate shall be distributed exclusively to one or more either charitable, religious, scientific, literary or educational organizations (as selected by the Trustees) which would then qualify under the provisions of Section 501 (c)(3) of the Internal Revenue Code and its Regulations as they now exist or as they may hereafter be amended. In the event this instrument has been recorded with the Recorder of Deeds, they shall file with said Recorder a notice that the Trust shall cease and determine; and, thereupon, the Trustees shall automatically be further discharged hereunder, PROVIDED, *360 their administration and distribution has been made in good faith, otherwise a court of competent jurisdiction may be invoked to review and correct any tort or error. On April 6, 1971, the trustees of PFT authorized a distribution of $5,000 to the holders of certificates of beneficial interest in proportion to their respective holdings. On May 19, 1971, the trustees authorized a distribution of $2,000 to Jerre Paxton alone and nothing to the other holders of certificates of beneficial interest. Proposals pertaining to disbursements of funds made by Jerre Paxton were always approved by the other trustees. During the relevant periods herein, PFT, through the actions of Jerre Paxton alone, as First Trustee, made charitable donations of $5,000 to the University of Plano, Plano, Texas, and other sums to the Salvation Army and the Union Gospel Mission in Yakima, Washington. The trustees and the certificate holders in PFT believed that the certificates of beneficial interests conveyed to the holders no more interest than a mere possibility of receiving disbursements of income or corpus from PFT at the sole discretion of the trustees.On June 17, 1970, the Commissioner of Internal Revenue *361 mailed to Floyd G. Paxton and Grace D. Paxton a statutory notice of deficiency covering income taxes for the taxable year 1967 in which he determined that the grantors of PFT were taxable on the net income of PFT for the period from October 1, 1967, through December 31, 1967, because "they granted a nonadverse party a power to revoke." On February 15, 1972, this Court filed its opinion in Paxton v. Commissioner,57 T.C. 627 (1972), in which we sustained the Commissioner's determination covered by his statutory notice of deficiency mailed June 17, 1970. On May 30, 1972, the trustees of PFT purported to "clarify" the declaration of trust of PFT. A "restatement declaration of trust" was prepared and executed by the grantor and the then trustees on May 30, 1972. It was ratified by all of the holders of certificates of beneficial interest in PFT. The May 30, 1972, declaration of trust is reproduced below. DECLARATION OF TRUST OF THIS CONSTITUTIONAL TRUST TO BE ADMINISTERED BY NATURAL PERSONS, HOLDING TITLE IN JOINT TENANCY, ACTING UNDER THEIR CONSTITUTIONAL RIGHTS AS CITIZENS OF THE UNITED STATES OF AMERICA
THIS DECLARATION OF TRUST AUTHORIZES ITS TRUSTEES TO OPERATE UNDER THE NAME *362 OF F. G. PAXTON FAMILY ORGANIZATION
THIS AGREEMENT, CONVEYANCE and ACCEPTANCE, made and entered into at the time and on the date appearing in the acknowledgment hereto attached, by and between FLOYD G. PAXTON, GRANTOR and CREATOR hereof, LORNE HOUSE, JERRE PAXTON, JAMES B. SHRADER, and DIANE IRWIN, ACCEPTORS hereof in joint tenancy who shall compose the Board of Trustees and Executive Officers for conducting business. THIS INDENTURE OF TRUST, made the 30th day of May, 1972, by and between the one or more persons subscribing this agreement under the heading at the end hereof entitled "Subscribers, Grantors, and Assignors" (such persons being hereinafter called the "Subscribers"), parties of the first part, and Lorne House, Jerre Paxton, James B. Shrader and Diane Irwin (such persons being hereinafter called the "Trustees"), parties of the second part, WITNESSETH WHEREAS, the Subscribers are deeply involved in the complex economic, social and cultural affairs of the world of today and are aware of the many uncertainties that exist in this changing world and of their responsibilities to friends, relatives, employees, charitable institutions, governmental service organizations and the *363 people of their municipalities, states and nation and have determined the this Trust is an instrument designed to best meet said responsibilities for the benefit of all such beneficiaries. WHEREAS, the Subscribers intend that the functions of this Trust shall therefore be to manage and operate as effectively as possible all properties with which the Trustees may from time to time be vested so as to maximize the economic potential thereof for the good of all beneficiaries, to make grants and donations to educational, scientific and religious institutions for and in the name of the Trust, and, if the Trustees in their sole discretion so determine, to make distributions from the net revenues of such operations to the account of and in the name of the Holders of Certificates of Interest. WHEREAS, the Trustees have consented to act as such hereunder on the terms and conditions hereinabove and hereinafter set forth: NOW, THEREFORE, in consideration of the premises and of the objects and purposes hereinabove and hereinafter set forth and of the sum of One Dollar ($1.00) in hand paid and other considerations of value, the receipt whereof is hereby acknowledged, the Subscribers and the Trustees, *364 each acting severally and not jointly, have and do hereby agree as follows: FIRST: The Subscribers do hereby irrevocably sell, assign, grant, convey, transfer and set over to the Trustees, to be held in joint tenancy with right of survivorship, the property described in Schedule "A" hereto annexed and made a part hereof, the receipt of which is hereby acknowledged by the Trustees, all of which property, together with any and all other property from time to time held by the Trustees under this indenture is hereinafter referred to as the "Trust Estate", upon trust for the uses and purposes hereinabove and hereinafter set forth, said Trustees to hold legal title in joint tenancy with right of survivorship, and not as tenants in common, to those certain properties constituting from time to time the Trust Estate and in connection therewith said Trustees shall collectively act by virtue of the covenants herein contained as a Board of Trustees under the name herein designated in respect to the Trust Estate and in connection therewith said Trustees shall collectively act by virtue of the covenants herein contained as a Board of Trustees under the name herein designated in respect to the Trust *365 Estate and in connection therewith may deal in properties, operations underway or contemplated, equities, formulae, entities, patents, and copyrights. SECOND: The name of this Trust and other things of value constituting the Trust Estate, including all rights in reversion, remainder, expectancies or inheritances, wherever situated and other things of value too numerous to mention, shall be held, administered and disposed of in accordance with and pursuant to the provisions of this indenture. THIRD: The principal place of business of this Trust shall be in the City of Yakima, County of Yakima, State of Washington, and is to be governed in all respects by the laws of the State of Washington. FOURTH: The Trustees, for themselves and their successors in trust, do hereby accept the conveyance and assignment in trust and acknowledge delivery of all of the property sold, assigned, granted, conveyed, transferred and set over to the Trustees described in Schedule "A" hereto annexed and the continuing operations of such property and accept all of the terms of the Trust set forth herein and the Trustees to hereby agree to conserve and improve the Trust, to continue the operations of the property *366 constituting the Trust Estate as if such property had not been parted with by the Subscribers in consideration for Certificates of Interest as contemplated by FIFTH hereof, to protect and preserve assets constituting the Trust Estate, to invest and reinvest the funds of said Trust Estate in the exercise of their best judgment and discretion, to make distribution of portions of the proceeds and income under the Trust Estate as in their discretion and according to the minutes to be maintained by the Trustees should be made, to make complete periodic reports as to the operations of the Trust and business transactions of the Trust, and, upon final liquidation of the Trust to distribute the assets constituting the then Trust Estate in accordance with the provisions hereof, and in all other respects to administer the Trust, and the Trust Estate, in good faith strictly in conformity hereto. FIFTH: In consideration for the sale, assignment grant, conveyance, transfer and setting over to the Trustees of the property described in Schedule "A" hereto annexed, the Trustees do simultaneously with the exception of the delivery of this indenture authorize, issue and deliver to the Subscribers units *367 reflected by Certificates of Interest to evidence the equitable interest contributing to the Trust Estate, said units reflected by Certificates of Interest being 100 in number and said Certificates of Interest shall be nonassessable, nontaxable and shall only be negotiable with the express prior consent of the Trustees under such regulations, if any, as shall be prescribed by the Board of Trustees. When and if authorized by the Board of Trustees but not otherwise, said Certificates of Interest shall pass by delivery. No Certificate of Interest which is registered with the Secretary of the Board of Trustees may in any other manner be transferred and any attempt to transfer any Certificate of Interest without the prior consent of the Trustees shall be null and void and of no force and effect. The Secretary of the Board of Trustees shall keep at the office of the Trust such books and other facilities for the registration and transfer of Certificates of Interest as shall be necessary for the purposes hereof, specifically including provision therein for the recordation of any consents to transfer at any time or from time to time given. Upon presentation for transfer of a Certificate *368 of Interest, the Secretary of the Board of Trustees shall present to the Board of Trustees the request for such transfer and the Board of Trustees shall, at a meeting appropriately called, determine whether or not to permit any such transfer to be made; Board of Trustees shall have the power to determine at any such meeting whether to decline the transfer of any such Certificate of Interest, to authorize the transfer of any such Certificate of Interest, or to elect to purchase for this Trust from the then holder of the Certificate of Interest at such price as the Board of Trustees in their sole and arbitrary discretion shall determine, regardless of market values, book values or other criteria for fair value, the units represented by such Certificate of Interest and to cancel such Certificate of Interest, without any right in the holder of such Certificate of Interest, so presenting the same for transfer to receive for the units of such Certificate of Interest any amount in excess of the repurchase price declared applicable thereto by the Board of Trustees.The units represented by such Certificates of Interest acquired by the Board of Trustees pursuant to the foregoing shall be cancelled *369 and not outstanding and shall at no time and under no circumstances ever be reissued to any person. SIXTH: No person whomsoever shall have any right or interest in any Certificate of Interest except the person named therein as the registered holder thereof. The registered holder of any Certificate of Interest shall have only the rights relating thereto which are specifically set forth herein and in the Certificate of Interest. All rights of the registered holder of any Certificate of Interest shall cease and terminate forthwith upon the death of the registered holder and the units represented by any such Certificate of Interest shall not pass by Will or by the laws of intestacy; no heir or legal representative of any deceased registered holder shall have any right of any kind whatsoever, by reason of the death of the registered holder or by the terms of any testamentary document or by the provisions of any contract or trust or other agreement entered into prior to the death of any such registered holder by such registered holder, to any interest whatsoever in this Trust or in any of the units, Certificate of Interest or any of the property or assets of the Trust, provided, however, *370 that the Board of Trustees of the Trust may, in their sole discretion, reissue, for such consideration as the Board of Trustees may determine, the units represented by any such Certificate of Interest to such person or persons as they may determine, including any person then constituting a registered holder of a Certificate of Interest or any person not so constituting a registered holder of Certificate of Interest. In the event that a registered holder of a Certificate of Interest shall cease to have and own any portion or all of any rights he may have under any such Certificate of Interest by reason of foreclosure, insolvency or other similar creditor's proceedings, then, for all purposes hereof, any such Certificate of Interest shall be null and void and of no force, effect, or value, and the units represented by any such Certificate of Interest shall be deemed to have been acquired by purchase by this Trust and shall be cancelled and not outstanding and never reissued. No holder of any Certificate of Interest shall have any right or power whatsoever to direct or otherwise influence the Trustees in the exercise of their sole discretion. No registered holder of any Certificate *371 of Interest shall have any right or power to alienate ownership of any Certificate of Interest or of the units represented thereby in any manner, whether by assignment, mortgage, pledge, testamentary document or otherwise, without the prior written consent of the Board of Trustees of this Trust. SEVENTH: It is hereby expressly declared that this instrument and the legal relationship constituted hereby constitutes a trust and that no partnership, association or corporation is hereby created. It is hereby further expressly declared that nothing herein contained shall constitute either the (a) Trustees, individually or collectively, alone, or (b) The Trustees and the agents and representatives of the Trustees when taken together, or (c) The holders alone of Certificates of Interest, present or future, or (d) The holders of Certificates of Interest, present or future, when taken together with the Trustees and/or with the representatives and agents of the Trustees, an association or partners with any other person. It is further expressly declared that none of the Trustees, none of the agents and representatives of the Trustees and none of the holders of Certificates of Interest, present *372 or future, have or possess, in any such capacities, any beneficial interest in the property or assets from time to time constituting all or any portion of the Trust Estate and that none of such persons shall be personally liable hereunder, as partners or otherwise, and that rights and duties of each such persons or groups of persons are several in accordance with the provisions hereof and not joint. No person acting as Trustee hereby shall be liable for the act or omission of any other person whatsoever, whether employed by such Trustee or not, or whether employed by the Trustees as an agent or representative of the Trustees, or for anything other than his own personal breach of trust. EIGHTH: The Trustees shall have, with respect to any and all property constituting the Trust Estate, whether real, personal or mixed, at any time held by them hereunder, full authority, in their absolute discretion, at any time and from time to time, to act in the management of this Trust as though the Trustees, acting as a body, were the beneficial owner of the Trust Estate including the authority (without limiting the generality of the foregoing): A. To retain any such property temporarily or permanently; *373 to sell or exchange or abandon the same, at public or private sale, for cash or upon credit, with or without security, or upon any terms the Trustees deem proper; to grant options upon, to mortgage, or to lease the same for any period or periods whatsoever; and otherwise deal in and with such property as the Trustees from time to time deem fit. B. To hold, invest, or reinvest in any securities or other real or personal property (whether domestic or foreign), or undivided interest therein, including shares or interest in investment companies or investment trusts, in any common trust funds, in voting trusts certificates, royalties and other mineral rights, or in real estate or mortgages thereon, or to bid in any property or choses in action at any foreclosure, without any duty to diversify and without regard to the proportion which any property, or property of a similar character, so held may bear to the entire amount of the Trust Estate and regardless of whether the same would in the absence of this provision constitute a legal investment for trustees or of whether the same is of a speculative nature rather than a conservative investment or of whether the same is productive or unproductive *374 and specifically, but without limiting the generality of the foregoing, to hold, invest, or reinvest all or any part of the entire Trust Estate in common or preferred stocks and even though some or all of such stocks might be considered speculative or might have no ready market. In connection with the operation or carrying on of any business or other operations of all or any portion of the Trust Estate the Trustees shall have the authority to manufacture, construct, assemble, fabricate or otherwise produce, purchase or otherwise acquire, design, develop, improve, install, service, maintain, repair, experiment with, hold, own, use, sell, lease, pledge, or otherwise dispose of, import, export, and trade and deal in and with, any and all goods, wares, merchandise, materials, machines, apparatus, appliances, products and property of every kind, nature and description and in connection therewith to acquire by purchase, exchange, lease or otherwise and to own, hold, develop, improve, operate, sell, assign, lease, transfer, convey, exchange, mortgage, pledge or otherwise dispose of or encumber real and personal property of any class and description and any rights and interest therein without *375 limit as to amount and wherever situated, and, further, in connection therewith, to undertake, conduct, manage, assist, promote, engage, or participate in every kind of engineering, research, scientific, experimental, design or development work and to act as consultants, operating managers, agents, or representatives of corporations, firms, individuals and others and as such to promote, manage, supervise, operate, develop or extend the business interests or properties constituting the Trust Estate and the business interests or properties of others, including corporations, firms, and individuals, and to acquire by purchase or otherwise, erect, construct, make, improve and operate, or aid in or subscribe towards the erecting, constructing, making, improving and operating of mills, factories, storehouses, buildings, roads, plants, and works of all kinds and to enter into, make and perform contracts of every kind and description with any person, firm, association, corporation, municipality, county, state, body politic or government, or colony or dependency thereof, and to adopt, apply for, obtain, register, purchase, lease, take assignments and licenses in respect of, or otherwise acquire, *376 and to maintain, protect, hold, own, use, enjoy, control, exercise, develop, operate, introduce, turn to account, grant licenses or other rights in respect of, sell, assign, lease, mortgage, pledge or otherwise dispose of any and all inventions, devices, formulae, processes and all improvements and modifications thereof, any and all letters patent and/or applications therefor of the United States of America or any country and all rights connected therewith of appertaining thereto, any and all copyrights granted by the United States of America or by any other country and any and all trade marks, trade names, trade symbols, goodwill and other indications of origin or ownership granted by or recognized under the laws or decisions of the United States of America or of any state thereof or any other country, and, without in any respect limiting the generality of foregoing, to do any and all things herein set forth to the same extent as fully as natural persons might or could do, in any part of the world, and as principal, agent, contractor, or otherwise, and either along or in conjunction with any other individuals, firms, associations, corporations, syndicates or bodies politic, including *377 the borrowing of money without limit and upon any terms that the Trustees may determine, giving such security as the Trustees may determine and otherwise to do any and all things necessary and proper for the accomplishment of the purposes herein before set forth of this Trust or necessary or incidental to the protection and benefit of this Trust. C. To employ such persons as the Trustees may determine to act as operational officers of the businesses and operations conducted with the property constituting all or any part of the Trust Estate and in connection therewith to employ agents, employees, accountants, brokers and investment counsel, individual or corporate, and to advise with counsel, who may be counsel for any Trustee individually, or with whom any Trustee may be associated, and to employ or deal with any firm or corporation with or in which any Trustee may be interested and to pay such salaries, fees, commissions, profits, benefits and allowances, directly or indirectly, in connection with any engagements as the Trustees may from time to time determine. D. To make all such grants, donations and distributions, in such amounts and when, as and if determined by the Trustees *378 to be made, as are contemplated by the second preamble to this Declaration of Trust. NINTH: The Trustees shall appoint a person, who need not be one of the Trustees, to act as the Secretary of the Trustees and to hold such office for such period of time and upon such terms and conditions as shall be determined by the Trustees at the time of such appointment and such Secretary shall maintain, or cause to be maintained, a permanent record of all proceedings of the Trustees. All proceedings and determinations of the Trustees shall, except as hereinafter provided, be made at meetings duly called, and provided that notice of each such meeting and the time, place and purposes thereof shall be given at least two (2) days in advance to each of the Trustees. Any Trustee may call a meeting of the Trustees upon the giving of such notice. Such notice may be waived by any Trustee by written instrument executed either before or after a meeting of the Trustees. The Trustees may also take any action, without holding any meeting, by executing a written instrument signed by at least the number of Trustees whose affirmative vote is required for the proposed action and such instrument may be in counterparts *379 respectively signed by the Trustees. The action of the majority of the whole number of Trustees expressed from time to time at a meeting or in writing with or without a meeting shall constitute the action of the Trustees and have the same effect as taken though by all. Any Trustee may, at any time, by an instrument in writing, appoint for a limited period of time not exceeding ninety (90) days, any other Trustee as his proxy and attorney, to perform specific duties or to exercise specific rights or to take specific action which the Trustee so appointing, would be entitled to perform, exercise or take as a Trustee. Each such proxy and power of attorney shall be revocable at any time by the Trustee executing the same, but no such revocation shall impair or affect any action taken pursuant thereto prior to such revocation. Any Trustee, or any firm or corporation of which such Trustee may be a member, director, or officer, may contract with the Trust or become pecuniarily interested in any matter or transaction to which the Trust may be a party, or in which it may in any way be concerned, as fully as though such person were not a Trustee, provided, however, that the general character *380 and extent of such interest, if any, of any such Trustee shall be disclosed to the other Trustees upon any request therefor. No Trustee shall be removable from office by the holders of Certificates of Interest for any reason at any time whatsoever. Any Trustee may be removed as such, but only for cause, upon the vote in favor of such removal of the majority of the remainder of the Trustees at the time in office at a meeting of the Trustees held not sooner than thirty (30) days following the actual delivery of notice of such proposed removal to the person so proposed to be removed as Trustee, which notice shall be accompanied by a detailed written list of particulars alleged to form the basis for the proposed removal. Any Trustee may at any time resign his office as such or limit his powers, duties, rights and/or liabilities as such in whole or in any part at any time and from time to time for such period of limitation as such Trustee shall elect, such election to be evidenced by an instrument in writing including a minute of proceedings of the Board of Trustees reflecting such limitation. In the event of the removal of a Trustee or the death or resignation of a Trustee or in the *381 case any vacancy shall be caused in the office of a Trustee for any other reason, a successor Trustee shall be selected and appointed by the remaining Trustees or Trustee, as the case may be, in office at the time. In the event that at any time there shall be only one person holding the office of Trustee, such Trustee shall designate in writing the person to be successor Trustee of the Trust in the event that such Trustee holding office shall cease to be a Trustee prior to his filling of vacancies in the offices of Trustees in the manner hereinabove provided prior to the time that such person shall cease to be a Trustee. Each Successor to any Trustee shall forthwith upon appointment become vested with all rights, powers, immunities and duties of his predecessor as Trustee. Notice of the Selection and appointment of any new Trustee or of any successor to a Trustee shall be periodically reported in accordance with the provisions of this indenture. No Trustee shall be required to give any bond or other security for the discharge of his duties as such Trustee. The initial number of Trustees shall be four (4) but such number may be increased, or decreased, from time to time for such *382 practical reasons beneficial to the Trust as the Trustees then in office may determine and the Trustees then in office shall fill all vacancies in the offices of Trustee caused by their action increasing the number of Trustees. The Trustees shall have and shall exercise collectively the exclusive management and control of the trust, the Trust Estate and operations constituting all or any portion of the Trust Estate. By unanimous action, the Trustees may amend from time to time the trust document. TENTH: This Trust shall continue for a period of twenty (20) years from date, unless the Trustees shall unanimously determine upon an earlier date. The Trustees may at their sole discretion, because of threatened depreciation in value, or other good and sufficient reason, liquidate the assets, distribute and close the trust at any earlier date determined by them. Upon such determination and dissolution of the Trust and the winding up of its affairs, the Trust Estate shall be distributed exclusively to one or more either charitable, religious, scientific, literary or educational organizations (as selected by the Trustees) which would then qualify under the provisions of Section 501(c)(3) of the Internal Revenue Code *383 and its regulations as they now exist or as they may hereafter be amended. In the event this instrument has been recorded with the County Auditor's office, they shall file with said Auditor a notice that the Trust shall cease and determine; and, thereupon, the Trustees shall automatically be further discharged hereunder, PROVIDED, their administration and distribution has been made in good faith, otherwise a court of competent jurisdiction may be invoked to review and correct any tort or error. ELEVENTH: At any time prior to the expiration of this Trust, by its terms or pursuant to any subsequent agreement, the Trustees may if they so desire and believe that said Trust should not be closed, renew this agreement for an additional period or periods each not to exceed twenty (20) years from date of renewal. A resolution of said renewal shall be entered upon the minutes (and also recorded with the County Auditor's office in the event this Trust has been recorded) at least one hundred twenty (120) days prior to the expiration hereof. IN WITNESS WHEREOF, the Subscribers, Grantors and Assignors and the Trustees have signed, sealed and executed this Agreement all as of the day and year *384 first above written. SUBSCRIBERS, GRANTORS & ASSIGNORS TRUSTEES IN WITNESS WHEREOF, the Grantor and Creator hereof and the Acceptors hereof, for themselves, their heirs and assigns, have hereunto set their hands and seals in token of the conveyance, delivery and acceptance of property, assets, or other things of value, and the obligations and duties as herein assumed as Trustees of said Trust and assent to all stipulations herein as imposed and expressed. COUNTY OF YAKIMA STATE OF WASHINGTON ss. I, Gerold W. Curtis, a Notary Public, an officer authorized by law to administer oaths, do hereby certify that FLOYD G. PAXTON, Creator, and LORNE HOUSE, JERRE PAXTON, JAMES B. SHRADER, and DIANE IRWIN, as Trustees of the F. G. PAXTON FAMILY ORGANIZATION, a Trust, personally appeared before me this day and acknowledged that they signed, sealed and delivered the above and foregoing Trust Indenture for the uses and purposes therein set forth, and that the Trustees by their signatures evidenced the acceptance of the duties, obligations and faithful performance of said Trust Indenture. On July 8, 1975, the United States Court of Appeals for the Ninth Circuit affirmed the decision of this Court *385 in Paxton v. Commissioner,520 F.2d 923 (9th Cir. 1975). On July 10, 1968, Floyd G. Paxton and Grace Paxton as "Subscribers, Grantors and Assigns" and Jerre H. Paxton and Lorne House as "Trustees" executed the following declaration of trust creating IDT: INTERNATIONAL DEVELOPMENT TRUST DECLARATION OF TRUST OF Floyd G. Paxtonand Grace Paxton
TO BE ADMINISTERED BY NATURAL PERSONS HOLDING TITLE IN JOINT TENANCY WITH RIGHT OF SURVIVORSHIP AS TRUSTEES THIS INDENTURE OF TRUST, made the 10th day of July, 1968, by and between the one or more persons subscribing this agreement under the heading at the end hereof entitled "Subscribers, Grantors, and Assignors" (such person or persons being hereinafter called "Subscribers"), parties of the first part, and Lorne House and Jerre H. Paxton (hereinafter called the "Trustees"), parties of the second part. WITNESSETH
WHEREAS, the Subscribers are deeply involved in the complex economic, social and cultural affairs of the world of today and are aware of the many uncertainties that exist in this changing world and of their responsibilities to friends, relatives, employees, charitable institutions, governmental service organizations and the people of *386 their municipalities, states and nation and have determined that this Trust is an instrument designed to best meet said responsibilities for the benefit of all such beneficiaries. WHEREAS, the Subscribers intend that the functions of this Trust shall therefore be to manage as effectively as possible all properties with which the Trustees may from time to time be vested so as to maximize the economic potential thereof for the good of all beneficiaries, to make grants and donations to educational, scientific and religious institutions for and in the name of the Trust, and, if the Trustees in their sole discretion so determine, to make distributions from the net revenues of such operations to the account of and in the name of the Holders of Certificates of Interest. WHEREAS, the Trustees have consented to act as such hereunder on the terms and conditions hereinabove and hereinafter set forth: NOW, THEREFORE, in consideration of the premises and of the objects and purposes hereinabove and hereinafter set forth and of the sum of One Dollar ($1.00) in hand paid and other considerations of value, the receipt whereof is hereby acknowledged, the Subscribers and the Trustees, each acting severally *387 and not jointly, have and do hereby agree as follows: FIRST: The Subscribers do hereby irrevocably sell, assign, grant, convey, transfer and set over to the Trustees, to be held in joint tenancy with right of survivorship, the property described in Schedule "A" hereto annexed and made a part hereof, the receipt of which is hereby acknowledged by the Trustees, all of which property, together with any and all other property from time to time held by the Trustees under this indenture is hereinafter referred to as the "Trust Estate", upon trust for the uses and purposes hereinabove and hereinafter set forth, said Trustees to hold legal title in joint tenancy with right of survivorship, and not as tenants in common, to those certain properties constituting from time to time the Trust Estate and in connection therewith said Trustees shall collectively act by virtue of the covenants herein contained as a Board of Trustees under the name herein designated in respect to the Trust Estate and in connection therewith may deal in properties, operations underway or contemplated, equities, formulae, entities, parents and copyrights. SECOND: The name of this Trust and other things of value constituting *388 the Trust Estate, including all rights in reversion, remainder, expectancies or inheritances, wherever situated and other things of value too numerous to mention, shall be held, administered and disposed of in accordance with and pursuant to the provisions of this indenture. THIRD: The principal place of business of this Trust shall be in the City of Yakima, County of Yakima, State of Washington, and is to be governed in all respects by the laws of the State of Washington. FOURTH: The Trustees, for themselves and their successors in trust, do hereby accept the conveyance and assignment in trust and acknowledge delivery of all of the property sold, assigned, granted, conveyed, transferred and set over to the Trustees described in Schedule "A" hereto annexed and the continuing operations of such property and accept all of the terms of the Trust set forth herein and the Trustees do hereby agree to conserve and improve the Trust, to continue the operations of the property constituting the Trust Estate as if such property had not been parted with by the Subscribers in consideration for the Certificates of Interest as contemplated in FIFTH hereof, to protect and preserve the assets constituting *389 the Trust Estate, to invest and reinvest the funds of said Trust Estate in the exercise of their best judgment and discretion, to make distribution of portions of the proceeds and income under the Trust Estate as in their discretion and according to the minutes to be maintained by the Trustees should be made, to make complete periodic reports as to the operations of the Trust and Business transactions of the Trust and, upon final liquidation of the Trust to distribute the assets constituting the then Trust Estate in accordance with the provisions hereof, and in all other respects to administer the Trust, and the Trust Estate, in good faith strictly in conformity hereto. FIFTH: In consideration for the sale, assignment, grant, conveyance, transfer and setting over to the Trustees of the property described in Schedule "A" hereto annexed, the Trustees do simultaneously with the acceptance of and delivery of this indenture authorize, issue and deliver to the Subscribers units reflected by Certificates of Interest to evidence the equitable interest contributing to the Trust Estate, said units reflected by Certificates of Interest being 100 in number and said Certificates of Interest being *390 substantially in form hereto attached as Annex I. Said Certificates of Interest shall be nonassessable, nontaxable and non-negotiable and shall not pass by delivery unless registered with the Secretary of the Board of Trustees and such registration noted upon any such Certificate of Interest so registered. The Secretary of the Board of Trustees shall keep at the office of the Trust books and other facilities for the registration and transfer of Certificates of Interest and upon presentation for such purpose the Secretary of the Board of Trustees shall register or cause to be registered therein and permit to be transferred thereon, under such reasonable regulations as the Secretary of the Board of Trustees may prescribe, any Certificates of Interest issued under this indenture. SIXTH: Ownership of Certificates of Interest in the Trust shall not entitle the holder thereof, whether or not registered, to any legal title in or to the Trust Estate nor to any undivided interest therein, nor any voice in the management of the Trust, nor to permit or entitle any heir or legal representative of a holder of any Certificate of Interest following his death to demand any partition or division *391 of the property of the Trust or to any special accounting. Death, insolvency or bankruptcy of any holder of a Certificate or Certificates of Interest or the transfer of any Certificate or Certificates of Interest by sale, devise or descent shall not operate as a dissolution of the Trust or in any manner affect the Trust, the operation or mode of business of the Trust or the Trust Estate. The Trustees may, in their sole discretion, at any time and from time to time, make any distribution of income from the operation of the Trust Estate and make any distribution of all or any portion of the assets comprising the Trust Estate for any reason to any of the holders of Certificates of Interest in the Trust and, except to the extent that the Trustees have given notice of their intention to make any distribution of income or of assets comprising any portion of the Trust Estate, the holders of Certificates of Interest shall have no right, title, or interest in or to any portion of the Trust Estate or of any income generated by the Trust Estate for any purpose whatsoever. SEVENTH: It is hereby expressly declared that this instrument and the legal relationship constituted hereby constitutes *392 a trust and that no partnership, association or corporation is hereby created. It is hereby further expressly declared that nothing herein contained shall constitute either the (a) Trustees alone, or (b) The Trustees and the agents and representatives of the Trustees when taken together, or (c) The holders alone of Certificates of Interest present or future, or (d) The holders of Certificates of Interest, present or future, when taken together with the Trustees and/or with the representatives and agents of the Trustees, an association or partners with any other person. It is further expressly declared that none of the Trustees, none of the agents and representatives of the Trustees and none of the holders of Certificates of Interest, present or future, have or possess any beneficial interest in the property or assets from time to time constituting all or any portion of the Trust Estate and that none of such persons shall be personally liable hereunder, as partners or otherwise, and that the rights and duties of each such persons or groups of persons are several in accordance with the provisions hereof and not joint. No person acting as Trustee hereby shall be liable for the act *393 or omission of any other person whatsoever, whether employed by such Trustee or not, or whether employed by the Trustees as an agent or representative of the Trustees, or for anything other than his own personal breach of trust. EIGHTH: The Trustees shall have, with respect to any and all property constituting the Trust Estate, whether real, personal or mixed at any time held by them hereunder, full authority, in their absolute discretion, at any time and from time to time, to act in the management of this Trust as though the Trustees, acting as a body, were beneficial owners of the Trust Estate, including the authority (without limiting the generality of the foregoing): A. To retain any such property temporarily or permanently; or to sell or exchange or abandon the same, at public or private sale, for cash or upon credit, with or without security, or upon any terms the Trustees deem proper; to grant options upon, to mortgage, or to lease the same for any period or periods whatsoever; and to operate sa going concerns or businesses any and all such property and in connection therewith to manager in such manner as any natural person could any such business or operations and to buy, *394 manufacture, sell and perform services in connection therewith and otherwise deal in and with such property as the Trustees from time to time deem fit, but only when necessary to affect its disposal. B. To hold, invest, or reinvest in any securities or other real or personal property (whether domestic or foreign), or undivided interests therein, including shares or interests in investment companies or investment trusts, in any common trust funds, in voting trusts certificates, royalties and other mineral rights, or in real estate or mortgages thereon, or to bid in any property or choses in action at any foreclosure, without any duty to diversify and without regard to the proportion which any property, or property of a similar character, so held may bear to the entire amount of the Trust Estate and regardless of whether the same would in the absence of this provision constitute a legal investment for trustees or of whether the same is of a speculative nature rather than a conservative investment or of whether the same is productive or unproductive and specifically, but without limiting the generality of the foregoing, to hold, invest, or reinvest all or any part of the entire Trust *395 Estate in common or preferred stocks and even though some or all of such stocks might be considered speculative or might have no ready market. In connection with the operation of all or any portion of the Trust Estate the Trustees shall have the authority to manufacture, construct, assemble, fabricate or otherwise produce, purchase or otherwise acquire, design, develop, improve, install, service, maintain, repair, experiment with, hold, own, use, sell, lease, pledge, or otherwise dispose of, import, export, and trade and deal in and with, any and all goods, wares, merchandise, materials, machines, aparatus, appliances, products and property of every kind, nature, and description and in connection therewith to acquire by purchase, exchange, lease or otherwise and to own, hold, develop, improve, operate, sell, assign, lease, transfer, convey, exchange, mortgage, pledge, or otherwise dispose of or encumber real and personal property of any class and description and any rights and interest therein without limit as to amount and wherever situated, and, further, in connection therewith, to undertake, conduct, manage, assist, promote, engage or participate in every kind of engineering, research, *396 scientific, experimental, design or development work and to act as consultants, operating managers, agents, or representatives of corporations, firms, individuals and others and as such to promote, manage, supervise, operate, develop or extend the business interests or properties constituting the Trust Estate and the business interests or properties of others, including corporations, firms and individuals, and to acquire by purchase or otherwise, erect, construct, make, improve and operate, or aid in or subscribe towards the erecting, constructing, making, improving and operating of mills factories, storehouses, buildings, roads, plants, and works of all kinds and to enter into, make and perform contracts of every kind and description with any person, firm, association, corporation, municipality, county, state, body politic or government, or colony or dependency thereof, and to adopt, apply for, obtain, register, purchase, lease, take assignments and licenses in respect of, or otherwise acquire, and to maintain, protect, hold, own, use, enjoy, control, exercise, develop, operate, introduce, turn to account, grant licenses or other rights in respect of, sell, assign, lease, mortgage, *397 pledge or otherwise dispose of any and all inventions, devices, formulae, processes and all improvements and modifications thereof, any and all letters patent and/or applications therefor of the United States of America or any country and all rights connected therewith or appertaining thereto, any and all copyrights granted by the United States of America or by any other country and any and all trade marks, trade names, trade symbols, goodwill and other indications of origin or ownership granted by or recognized under the laws or decisions of the United States of America or any other country, and, without in any respect limiting the generality of the foregoing, to do any and all things herein set forth to the same extent as fully as natural persons might or could do, in any part of the world, and as principal, agent, contractor, or otherwise, and either alone or in conjunction with any other individuals, firms, associations, corporations, syndicates or bodies politic, including the borrowing of money without limit and upon any terms that the Trustees may determine, giving such security as the Trustees may determine and otherwise to do any and all things necessary and proper for the *398 accomplishment of the purposes herein before set forth of this Trust or necessary or incidental to the protection and benefit of this Trust. C. To employ such persons as the Trustees may determine to act as operational officers of the operations conducted with the property constituting all or any part of the Trust Estate and in connection therewith to employ agents, employees, accountants, brokers and investment counsel, individual or corporate, and to advise with counsel, who may be counsel for any Trustee, individually or with whom any Trustee may be associated and to employ or deal with any firm or corporation with or in which any Trustee may be interested and to pay such salaries, fees, commissions, profits, benefits and allowances, directly or indirectly, in connection with any engagement as the Trustees may from time to time determine. D. To make all such grants, donations and distributions, in such amounts and when, as and if determined by the Trustees to be made, as are contemplated by the second preamble to this Declaration of Trust. NINTH: The Trustees shall appoint a person, who need not be one of the Trustees, to act as the Secretary of the Trustees to hold such office *399 for such period of time and upon such terms and conditions as shall be determined by the Trustees at the time of such appointment and such Secretary shall maintain, or cause to be maintained, a permanent record of all proceedings of the Trustees. All proceedings and determinations of the Trustees shall, except as hereinafter provided, be made at meetings duly called and provided that notice of each such meeting and the time, place and purpose thereof shall be given at least two (2) days in advance to each of the Trustees. Any Trustee may call a meeting of the Trustees upon the giving of such notice. Such notice may be waived by any Trustee by written instrument executed either before or after a meeting of the Trustees. The Trustees may also take any action, without holding any meeting, by executing a written instrument signed by at least the number of Trustees whose affirmative vote is required for the proposed action and such instrument may be in counterparts respectively signed by the Trustees.The action of the majority of the whole number of the Trustees expressed from time to time at a meeting or in writing, with or without a meeting shall constitute the action of the Trustees *400 and have the same effect as though taken by all. Any Trustee may, at any time, by an instrument of writing, appoint for a limited period of time not exceeding ninety (90) days, any other Trustee as his proxy and attorney, to perform specific duties or to exercise specific rights or to take specificaction which the Trustee so appointing, would be entitled to perform, exercise or take as a Trustee. Each such proxy and power of attorney shall be revocable at any time by the Trustee executing the same, but no such revocation shall impair or affect any action taken pursuant thereto prior to such revocation. Any Trustee, or any firm or corporation of which such Trustee may be a member, director, or officer, may contract with the Trust or become pecuniarily interested in any matter or transaction to which the Trust may be a party, or in which it may in any way be concerned, as fully as though such person were not a Trustee, provided, however, that the general character and extent of such interest, if any, of any such Trustee shall be disclosed to the other Trustees upon any request therefore. No Trustee shall be removable from office by the holders of Certificates of Interest for any reason *401 at any time whatsoever. Any Trustee may be removed from office by any court of competent jurisdiction after the exhaustion by the person so proposed to be removed of all his legal and equitable rights and remedies, including the right of appeal. Any Trustee may also be removed as such, but only for cause, upon the vote in favor of such removal of the majority of the remainder of the Trustees at the time in office at a meeting of the Trustees held not sooner than thirty (30) days following the actual delivery of notice of such proposed removal to the person so proposed to be removed as Trustee, which notice shall be accompanied by a detailed written list of particulars alleged to form the basis for the proposed removal. In the event of the removal of a Trustee or the death or resignation of a Trustee or in the case any vacancy shall be caused in the office of a Trustee for any other reason, a successor Trustee shall be selected and appointed by the remaining Trustees or Trustee as the case may be, in office at the time. In the event that at any time there shall be only one person holding the office of Trustee, such Trustee shall designate in writing the person to be successor Trustee *402 of the Trust in the event that such Trustee holding office shall cease to be a Trustee prior to his filling of vacancies in the office of Trustees in the manner hereinabove provided prior to the time that such person shall cease to be a Trustee. Each successor to any Trustee shall forthwith upon appointment become vested with all rights, powers, immunities, and duties of his predecessor as Trustee. Notice of the selection and appointment of any new Trustee or of any successor to a Trustee shall be periodically reported in accordance with the provision of this indenture. No Trustee shall be required to give any bond or other security for the discharge of his duties as such Trustee. The initial number of Trustees shall be two (2) but such number may be increased, or decreased, from time to time for such practical reasons beneficial to the Trust as the Trustees then in office may determine and the Trustees then in office shall fill all vacancies in the offices of Trustee caused by their action increasing the number of Trustees. The Trustees shall have and shall exercise collectively the exclusive management and control of the trust, the Trust Estate and operations constituting all *403 or any portion of the Trust Estate. By unanimous action, the Trustees may amend from time to time the trust document. TENTH: This Trust shall continue for a perod of twenty (20) years from date, unless the Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in value, or other good and sufficient reasons, liquidate the assets, distribute and close the Trust at any earlier date determined by them. Upon the dissolution of the Trust and the winding up of its affairs, the Trust Estate shall be distributed exclusively to one or more either charitable, religious, scientific, literary or educational organizations (as selected by the Trustees) which would then qualify under the provisions of Section 501 (c) (3) of the Internal Revenue Code and its Regulations as they now exist or as they may hereafter be amended. In the event this instrument has been recorded with the Recorder of Deeds, they shall file with said Recorder a notice that the Trust shall cease and determine; and, thereupon, the Trustees shall automatically be further discharged hereunder, PROVIDED, their administration and distribution has been *404 made in good faith, otherwise a court of competent jurisdiction may be invoked to review and correct any tort or error. ELEVENTH: At the expiration of this Trust, or any subsequent agreement, then the Trustees, if they so desire and believe that said Trust should not be closed, may renew this agreement for a like or shorter period. A resolution of said renewal shall be entered upon the minutes (and also recorded with the County Auditor's office in the event this Trust has been recorded) at least one hundred twenty (120) days prior to the expiration hereof IN WITNESS WHEREOF, the Subscribers, Grantors and Assignors, and the Trustees have signed, sealed and executed this Agreement all as of the day and year first above written. SUBSCRIBERS, GRANTORS & ASSIGNS TRUSTEES On July 12, 1968, Floyd Paxton assigned to IDT U.S. Patent Nos. 3,270,872 and 3,270,873. The assignment was recorded in the U.S. Patent Office on April 10, 1969, after which date IDT was shown as the assignee and owner of the patents. In addition to the transfer of U.S. Patent Nos. 3,270,872 and 3,270,873, Floyd and Grace Paxton, on July 12, 1968, transferred to IDT the following assets: Australia Applications Nos. *405 49,899/64 and 49,898/64 AustriaPatents Nos. 252,797 and 252,112 BelgiumPatents Nos. 655,008 and 654,627 Canada Patents Nos. 747,099 and 746,207
Denmark Applications Nos. 4,802/64 and 4,860/64 EnglandPatents Nos. 1,040,535 and 1,038,510
Finland Applications Nos. 2,043/64 and 2,100/64 FrancePatents Nos. 1,413,291 and 1,419,835
Germany Applications Nos. P35, 377VII/81C and P35, 378X/3992 Great Britain Letters Patent Nos. 1,040,535 and 1,038,510
Holland Applications Nos. 6,411,620 and 6,411,621 ItalyPatents Nos. 22,452 and 22,453 Japan Patents Nos. 482, 673 and 481,941 LuxembourgPatents Nos. 47,281 and 47,191 New Zealand Applications Nos. 139,529 and 139,530 NorwayPatent No. 110,506 and Application No. 154,919 Phillippines Applications Nos. 6,063 and 6,064 PortugalPatents Nos. 43,059 and 43,060 South Africa Patents Nos. 64/4,597 and 64/4,598 SpainPatents Nos. 304,808 and 305,208 SwedenPatents Nos. 217,360 and 217,361 SwitzerlandPatents Nos. 412,694 and 421,803 In exchange for such assets, IDT issued to Floyd and Grace Paxton each a certificate reflecting 50 units of beneficial ownership of IDT. On August 7, 1968, Floyd and Grace Paxton executed instruments transferring the *406 following number of units of interest in IDT to the following persons: Transferee
No. of Units
Jerre Paxton
10
Ted Paxton
8
Cheryl Paxton
8
Ande Paxton
8
Diane Irwin
8
Floyd G. Paxton, Jr.
8 The trustees of IDT for the periods here involved were: July 1, 1968 to
September 10, 1968
Jerre Paxton, Lorne House
September 10, 1968 to
end of period here
involved
Jerre Paxton, Lorne House,
James Shrader, Dale Leach [1]
Peter Lind [2]
Neither Floyd G. Paxton nor Grace Paxton was ever a trustee of IDT. On July 11, 1968, Lorne House and Jerre Paxton, the original trustees of IDT, unanimously took the following action as trustees: Jerre Paxton was appointed as First Trustee and Trust Manager to handle individually all the affairs and business of the trust estate, to make distributions of portions and proceeds and income of the trust in his sole discretion, the right to appoint his successor as First Trustee, and to preside at meetings of the Board of Trustees. No official action by the trust may be taken without his consent. On January *407 23, 1973, Floyd G. Paxton and Grace Paxton as grantors and Jerre Paxton, Lorne House, Peter Lind, Dale Leach and James B. Shrader as trustees executed a "Restatement Declaration of Trust" of IDT which is reproduced below: DECLARATION OF TRUST OF THIS CONSTITUTIONAL TRUST TO BE ADMINISTERED BY NATURAL PERSONS, HOLDING TITLE IN JOINT TENANCY, ACTING UNDER THEIR CONSTITUTIONAL RIGHTS AS CITIZENS OF THE UNITED STATES OF AMERICA
THIS DECLARATION OF TRUST AUTHORIZES ITS TRUSTEES TO OPERATE UNDER THE NAME OF INTERNATIONAL DEVELOPMENT TRUST
THIS AGREEMENT, CONVEYANCE and ACCEPTANCE, made and entered into at the time and on the date appearing in the acknowledgement hereto attached, by and between FLOYD G. PAXTON and GRACE PAXTON, GRANTORS and CREATORS hereof, JERRE PAXTON, LORNE HOUSE, PETER LIND, DALE LEACH, and JAMES B. SHRADER, ACCEPTORS hereof in joint tenancy who shall compose the Board of Trustees and Executive Officers for conducting business. THIS INDENTURE OF TRUST, made the 18th day of January, 1973, by and between the one or more persons subscribing this agreement under the heading at the end hereof entitled "Subscribers, Grantors, and Assignors" (such persons being hereinafter *408 called the "Subscribers"), parties of the first part, and Jerre Paxton, Lorne House, Peter Lind, Dale Leach and James B. Shrader (such persons hereinafter called the "Trustees"), parties of the second part, WITNESSETH WHEREAS, the Subscribers are deeply involved in the complex economic, social and cultural affairs of the world of today and are aware of the many uncertainties that exist in this changing world and of their responsibilities to friends, relatives, employees, charitable institutions, governmental service organizations and the people of their municipalities, states and nation and have determined that this Trust is an instrument designed to best meet said responsibilities for the benefit of all such beneficiaries. WHEREAS, the Subscribers intend that the functions of this Trust shall therefore be to manage and operate as effectively as possible all properties with which the Trustees may from time to time be vested so as to maximize the economic potential thereof for the good of all beneficiaries, to make grants and donations to educational, scientitic and religious institutions for and in the name of the Trust, and, if the Trustees in their sole discretion so determine, *409 to make distributions from the net revenues of such operations to the account of and in the name of the Holders of Certificates of Interest. WHEREAS, the Trustees have consented to act as such hereunder on the terms and conditions hereinabove and hereinafter set forth: NOW, THEREFORE, in consideration of the premises and of the objects and purposes hereinabove and hereinafter set forth and of the sum of One Dollar ($1.00) in hand paid and other considerations of value, the receipt whereof is hereby acknowledged, the Subscribers and Trustees, each acting severally and not jointly, have and do hereby agree as follows: FIRST: The Subscribers do hereby irrevocably sell, assign, grant, convey, transfer and set over to the Trustees, to be held in joint tenancy with right of survivorship, the property described in Schedule "A" hereto annexed and made a part hereof, the receipt of which is hereby acknowledged by the Trustees, all of which property, together with any and all other property from time to time held by the Trustees under this indenture is hereinafter referred to as the "Trust Estate", upon trust for the uses and purposes hereinabove and hereinafter set forth, said Trustees to *410 hold legal title in joint tenancy with right of survivorship, and not as tenants in common, to those certain properties constituting from time to time the Trust Estate and in connection therewith said Trustees shall collectively act by virtue of the covenants herein contained as a Board of Trustees under the name herein designated in respect to the Trust Estate and in connection therewith said Trustees shall collectively act by virtue of the covenants herein contained as a Board of Trustees under the name herein designated in respect to the Trust Estate and in connection therewith may deal in properties, operations underway or contemplated, equities, formulae, entities, patents, and copyrights. SECOND: The name of this Trust and other things of value constituting the Trust Estate, including all rights in reversion, remainder, expectancies or inheritances, wherever situated and other things of value too numerous to mention, shall be held, administered and disposed of in accordance with and pursuant to the provisions of this indenture. THIRD: The principal place of business of this Trust shall be in the City of Yakima, County of Yakima, State of Washington, and is to be governed in *411 all respects by the laws of the State of Washington. FOURTH: The Trustees, for themselves and their successors in trust, do hereby accept the conveyance and assignment in trust and acknowledge delivery of all of the property sold, assigned, granted, conveyed, transferred and set over to the Trustees described in Schedule "A" hereto annexed and the continuing operations of such property and accept all of the terms of the Trust set forth herein and the Trustees do hereby agree to conserve and improve the Trust, to continue the operations of the property constituting the Trust Estate as if such property had not been parted with by the Subscribers in consideration for Certificates of Interest as contemplated by FIFTH hereof, to protect and preserve assets constituting the Trust Estate, to invest and reinvest the funds of said Trust Estate in the exercise of their best judgment and discretion, to make distribution of portions of the proceeds and income under the Trust Estate as in their discretion and according to the minutes to be maintained by the Trustees should be made, to make complete periodic reports as to the operations of the Trust and business transactions of the Trust, and, *412 upon final liquidation of the Trust to distribute the assets constituting the then Trust Estate in accordance with the provisions hereof, and in all other respect to administer the Trust, and the Trust Estate, in good faith strictly in conformity hereto. FIFTH: In consideration for the sale, assignment, grant, conveyance, transfer and setting over to the Trustees of the property described in Schedule "A" hereto annexed, the Trustees do simultaneously with the exception of the delivery of this indenture authorize, issue and deliver to the Subscribers units reflected by Certificates of Interest to evidence the equitable interest contributing to the Trust Estate, said units reflected by Certificates of Interest being 100 in number and said Certificates of Interest shall be nonassessable, nontaxable and shall only be negotiable with the express prior consent of the Trustees under such regulations, if any, as shall be prescribed by the Board of Trustees. When and if authorized by the Board of Trustees but not otherwise, said Certificates of Interest shall pass by delivery. No Certificate of Interest which is registered with the Secretary of the Board of Trustees may in any other manner *413 be transferred and any attempt to transfer any Certificate of Interest without the prior consent of the Trustees shall be null and void and of no force and effect. The Secretary of the Board of Trustees shall keep at the office of the Trust such books and other facilities for the registration and transfer of Certificates of Interest as shall be necessary for the purposes hereof, specifically including provision therein for the recordation of any consents to transfer at any time or from time to time given. Upon presentation for transfer of a Certificate of Interest, the Secretary of the Board of Trustees shall present to the Board of Trustees the request for such transfer and the Board of Trustees shall, at a meeting appropriately called, determine whether or not to permit any such transfer to be made; Board of Trustees shall have the power to determine at any such meeting whether to decline the transfer of any such Certificate of Interest, to authorize the transfer of any such Certificate of Interest, or to elect to purchase for this Trust from the then holder of the Certificate of Interest at such price as the Board of Trustees in their sole and arbitrary discretion shall determine, *414 regardless of market values, book values or other criteria for fair value, the units represented by such Certificate of Interest and to cancel such Certificate of Interest, without any right in the holder of such Certificate of Interest, so presenting the same for transfer to receive for the units of such Certificate of Interest any amount in excess of the repurchase price declared applicable thereto by the Board of Trustees. The units represented by such Certificates of Interest acquired by the Board of Trustees pursuant to the foregoing shall be cancelled and not outstanding and shall at no time and under no circumstances ever be reissued to any person. SIXTH: No person whomsoever shall have any right or interest in any Certificate of Interest except the person named therein as the registered holder thereof. The registered holder of any Certificate of Interest shall have only the rights relating thereto which are specifically set forth herein and in the Certificate of Interest. All rights of the registered holder of any Certificate of Interest shall cease and terminate forthwith upon the death of the registered holder and the units represented by any such Certificate of Interest *415 shall not pass by Will or by the laws of intestacy; no heir or legal representative of any deceased registered holder shall have any right of any kind whatsoever, by reason of the death of the registered holder or by the terms of any testamentary document or by the provisions of any contract or trust or other agreement entered into prior to the death of any such registered holder by such registered holder, to any interest whatsoever in this Trust or in any of the units, Certificate of Interest or any of the property or assets of the Trust, provided, however, that the Board of Trustees of the Trust may, in their sole discretion, reissue, for such consideration as the Board of Trustees may determine, the units represented by any such Certificate of Interest to such person or persons as they may determine, including any person then constituting a registered holder of a Certificate of Interest or any person not so constituting a registered holder of Certificate of Interest. In the event that a registered holder of a Certificate of Interest shall cease to have and own any portion or all of any rights he may have under any such Certificate of Interest by reason of foreclosure, insolvency *416 or other similar creditor's proceedings, then, for all purposes hereof, any such Certificate of Interest shall be null and void and of no force, effect, or value, and the units represented by any such Certificate of Interest shall be deemed to have been acquired by purchase by this Trust and shall be cancelled and not outstanding and never reissued. No holder of any Certificate of Interest shall have any right or power whatsoever to direct or otherwise influence the Trustees in the exercise of their sole discretion. No registered holder of any Certificate of Interest shall have any right or power to alienate ownership of any Certificate of Interest or of the units represented thereby in any manner, whether by assignment, mortgage, pledge, testamentary document or otherwise, without the prior written consent of the Board of Trustees of this Trust. SEVENTH: It is hereby expressly declared that this instrument and the legal relationship constituted hereby constitutes a trust and that no partnership, association or corporation is hereby created. It is hereby further expressly declared that nothing herein contained shall constitute either the (a) Trustees, individually or collectively, *417 alone, or (b) The Trustees and the agents and representatives of the Trustees when taken together, or (c) The holders alone of Certificates of Interest, present or future, or (d) The holders of Certificates of Interest, present or future, when taken together with the Trustees and/or with the representatives and agents of the Trustees, an association or partners with any other person. It is further expressly declared that none of the Trustees, none of the agents and representatives of the Trustees and none of the holders of Certificates of Interest, present or future, have or possess, in any such capacities, any beneficial interest in the property or assets from time to time constituting all or any portion of the Trust Estate and that none of such persons shall be personally liable hereunder, as partners or otherwise, and that rights and duties of each such persons or groups of persons are several in accordance with the provisions hereof and not joint. No person acting as Trustee hereby shall be liable for the act or omission of any other person whatsoever, whether employed by such Trustee or not, or whether employed by the Trustees as an agent or representative of the Trustees, or *418 for anything other than his own personal breach of trust. EIGHTH: The Trustees shall have, with respect to any and all property constituting the Trust Estate, whether real, personal or mixed, at any time held by them hereunder, full authority, in their absolute discretion, at any time and from time to time, to act in the management of this Trust as though the Trustees, acting as a body, were the beneficial owner of the Trust Estate including the authority (without limiting the generality of the foregoing): A. To retain any such property temporarily or permanently; to sell or exchange or abandon the same, at public or private sale, for cash or upon credit, with or without security, or upon any terms the Trustees deem proper; to grant options upon, to mortgage, or to lease the same for any period or periods whatsoever; and otherwise deal in and with such property as the Trustees from time to time deem fit. B. To hold, invest, or reinvest in any securities or other real or personal property (whether domestic or foreign), or undivided interest therein, including shares or interest in investment companies or investment trusts, in any common trust funds, in voting trusts certificates, *419 royalties and other mineral rights, or in real estate or mortgages thereon, or to bid in any property or choses in action at any foreclosure, without any duty to diversify and without regard to the proportion which any property, or property of a similar character, so held may bear to the entire amount of the Trust Estate and regardless of whether the same would in the absence of this provision constitute a legal investment for trustees or of whether the same is of a speculative nature rather than a conservative investment or of whether the same is productive or unproductive and specifically, but without limiting the generality of the foregoing, to hold, invest, or reinvest all or any part of the entire Trust Estate in common or preferred stocks and even though some or all of such stocks might be considered speculative or might have no ready market.
In connection with the operation or carrying on of any business or other operations of all or any portion of the Trust Estate the Trustees shall have the authority to manufacture, construct, assemble, fabricate or otherwise produce, purchase or otherwise acquire, design, develop, improve, install, service, maintain, repair, experiment with, *420 hold, own, use, sell, lease, pledge, or otherwise dispose of, import, export, and trade and deal in and with, any and all goods, wares, merchandise, materials, machines, apparatus, appliances, products and property of every kind, nature and description and in connection therewith to acquire by purchase, exchange, lease or otherwise and to own, hold, develop, improve, operate, sell, assign, lease, transfer, convey, exchange, mortgage, pledge or otherwise dispose of or encumber real and personal property of any class and description and any rights and interest therein without limit as to amount and wherever situated, and, further, in connection therewith, to undertake, conduct, manage, assist, promote, engage, or participate in every kind of engineering, research, scientific, experimental, design or development work and to act as consultants, operating managers, agents, or representatives of corporations, firms, individuals and others and as such to promote, manage, supervise, operate, develop or extend the business interests or properties constituting the Trust Estate and the business interests or properties of others, including corporations, firms, and individuals, and to acquire *421 by purchase or otherwise, erect, construct, make, improve and operate, or aid in or subscribe towards the erecting, constructing, making, improving and operating of mills, factories, storehouses, buildings, roads, plants, and works of all kinds and to enter into, make and perform contracts of every kind and description with any person, firm, association, corporation, municipality, county, state, body politic or government, or colony or dependency thereof, and to adopt, apply for, obtain, register, purchase, lease, take assignments and licenses in respect of, or otherwise acquire, and to maintain, protect, hold, own, use, enjoy, control, exercise, develop, operate, introduce, turn to account, grant licenses or other rights in respect of, sell, assign, lease mortgage, pledge or otherwise dispose of any and all inventions, devices, formulae, processes and all improvements and modifications thereof, any and all letters patent and/or applications therefor of the United States of America or any country and all rights connected therewith or appertaining thereto, any and all copyrights granted by the United States of America or by any other country and any and all trade marks, trade names, *422 trade symbols, goodwill and other indications of origin or ownership granted by or recognized under the laws or decisions of the United States of America or of any state thereof or any other country, and, without in any respect limiting the generality of foregoing, to do any and all things herein set forth to the same extent as fully as natural persons might or could do, in any part of the world, and as principal, agent, contractor, or otherwise, and either along or in conjunction with any other individuals, firms, associations, corporations, syndicates or bodies politic, including the borrowing of money without limit and upon any terms that the Trustees may determine, giving such security as the Trustees may determine and otherwise to do any and all things necessary and proper for the accomplishment of the purposes herein before set forth of this Trust or necessary or incidental to the protection and benefit of this Trust. C. To employ such persons as the Trustees may determine to act as operational officers of the businesses and operations conducted with the property constituting all or any part of the Trust Estate and in connection therewith to employ agents, employees, accountants, *423 brokers and investment counsel, individual or corporate, and to advise with counsel, who may be counsel for any Trustee individually, or with whom any Trustee may be associated, and to employ or deal with any firm or corporation with or in which any Trustee may be interested and to pay such salaries, fees, commissions, profits, benefits and allowances, directly or indirectly, in connection with any engagements as the Trustees may from time to time determine. D. To make all such grants, donations and distributions, in such amounts and when, as and if determined by the Trustees to be made, as are contemplated by the second preamble to this Declaration of Trust. NINTH: The Trustees shall appoint a person, who need not be one of the Trustees, to act as the Secretary of the Trustees and to hold such office for such period of time and upon such terms and conditions as shall be determined by the Trustees at the time of such appointment and such Secretary shall maintain, or cause to be maintained, a permanent record of all proceedings of the Trustees. All proceedings and determinations of the Trustees shall, except as hereinafter provided, be made at meetings duly called, and provided that *424 notice of each such meeting and the time, place and purposes thereof shall be given at least two (2) days in advance to each of the Trustees. Any Trustee may call a meeting of the Trustees upon the giving of such notice. Such notice may be waived by any trustee by written instrument executed either before or after a meeting of the Trustees. The Trustees may also take any action, without holding any meeting, by executing a written instrument signed by at least the number of Trustees whose affirmative vote is required for the proposed action and such instrument may be in counterparts respectively signed by the Trustees. The action of the majority of the whole number of Trustees expressed from time to time at a meeting or in writing with or without a meeting shall constitute the action of the Trustees and have the same effect as taken though by all. Any Trustee may, at any time, by an instrument in writing, appoint for a limited period of time not exceeding ninety (90) days, any other Trustee as his proxy and attorney, to perform specific duties or to exercise specific rights or to take specific action which the Trustee so appointing, would be entitled to perform, exercise or take *425 as a Trustee. Each such proxy and power of attorney shall be revocable at any time by the Trustee executing the same, but no such revocation shall impair or affect any action taken pursuant thereto prior to such revocation. Any Trustee, or any firm or corporation of which such Trustee may be a member, director, or officer, may contract with the Trust or become pecuniarily interested in any matter or transaction to which the Trust may be a party, or in which it may in any way be concerned, as fully as though such person were not a Trustee, provided, however, that the general character and extent of such interest, if any, of any such Trustee shall be disclosed to the other Trustees upon any request therefor. No Trustee shall be removable from office by the holders of Certificates of Interest for any reason at any time whatsoever. Any Trustee may be removed as such, but only for cause, upon the vote in favor of such removal of the majority of the remainder of the Trustees at the time in office at a meeting of the Trustees held not sooner than thirty (30) days following the actual delivery of notice of such proposed removal to the person so proposed to be removed as Trustee, which *426 notice shall be accompanied by a detailed written list of particulars alleged to form the basis for the proposed removal. Any Trustee may at any time resign his office as such or limit his powers, duties, rights and/or liabilities as such in whole or in any part at any time and from time to time for such period of limitation as such Trustee shall elect, such election to be evidenced by an instrument in writing including a minute of proceedings of the Board of Trustees reflecting such limitation. In the event of the removal of a Trustee or the death or resignation of a Trustee or in the case any vacancy shall be caused in the office of a Trustee for any other reason, a successor Trustee shall be selected and appointed by the remaining Trustees or Trustee, as the case may be, in office at the time. In the event that at any time there shall be only one person holding the office of Trustee, such Trustee shall designate in writing the person to be successor Trustee of the Trust in the event that such Trustee holding office shall cease to be a Trustee prior to his filling of vacancies in the offices of Trustees in the manner hereinabove provided prior to the time that such person shall *427 cease to be a Trustee. Each Successor to any Trustee shall forthwith upon appointment become vested with all rights, powers, immunities and duties of his predecessor as Trustee. Notice of the Selection and appointment of any new Trustee or of any successor to a Trustee shall be periodically reported in accordance with the provisions of this indenture. No Trustee shall be required to give any bond or other security for the discharge of his duties as such Trustee. The initial number of Trustees shall be five (5) but such number may be increased, or decreased, from time to time for such practical reasons beneficial to the Trust as the trustees then in office may determine and the Trustees then in office shall fill all vacancies in the offices of Trustee caused by their action increasing the number of Trustees. The Trustees shall have and shall exercise collectively the exclusive management and control of the trust, the Trust Estate and operations constituting all or any portion of the Trust Estate. By unanimous action, the Trustees may amend from time to time the trust document. TENTH: This Trust shall continue for a period of twenty (20) years from date, unless the Trustees shall *428 unanimously determine upon an earlier date. The Trustees may at their sole discretion, because of threatened depreciation in value, or other good and sufficient reason, liquidate the assets, distributes and close the trust at any earlier date determined by them.Upon such determination and dissolution of the Trust and the winding up of its affairs, the Trust Estate shall be distributed exclusively to one or more either charitable, religious, scientific, literary or educational organizations (as selected by the Trustees) which would then qualify under the provisions of Section 501(c)(3) of the Internal Revenue Code and its regulations as they now exist or as they may hereafter be amended. In the event this instrument has been recorded with the County Auditor's office, they shall file with said Auditor a notice that the Trust shall cease and determine; and, thereupon, the Trustees shall automatically be further discharged hereunder, PROVIDED, their administration and distribution has been made in good faith, otherwise a court of competent jurisdiction may be invoked to review and correct any tort or error. ELEVENTH: At any time prior to the expiration of this Trust, by its terms or *429 pursuant to any subsequent agreement, the Trustees may if they so desire and believe that said Trust should not be closed, renew this agreement for an additional period or periods each not to exceed twenty (20) years from date of renewal. A resolution of said renewal shall be entered upon the minutes (and also recorded with the County Auditor's office in the event this Trust has been recorded) at least one hundred twenty (120) days prior to the expiration hereof. IN WITNESS WHEREOF, The Subscribers, Grantors and Assignors and the Trustees have signed, sealed and executed this Agreement all as of the day and year first above written. IN WITNESS WHEREOF, the Grantors and Creators hereof and the Acceptors hereof, for themselves, their heirs and assigns, have hereunto set their hands and seals in token of the conveyance, delivery and acceptance of property, assets, or other things of value, and the obligations and duties as herein assumed as Trustees of said Trust and assent to all stipulations herein as imposed and expressed. COUNTY OF YAKIMASTATE OF WASHINGTON
ss. I, Gerald W. Curtis, a Notary Public, an officer authorized by law to administer oaths, do hereby certify that FLOYD *430 G. PAXTON and GRACE PAXTON, Creators, and JERRE PAXTON, LORNE HOUSE, PETER LINE, DALE LEACH and JAMES B. SHRADER, as Trustees of the INTERNATIONAL DEVELOPMENT TRUST, personally appeared before me this day and acknowledged that they signed, sealed and delivered the above the foregoing Trust Indenture for the uses and purposes therein set forth, and that the Trustees by their signatures evidenced the acceptance of the duties, obligations and faithful performance of said Trust Indenture. RESTATEMENT DECLARATION OF TRUST OF THIS CONSTITUTIONAL TRUST The foregoing Restatement of Declaration of Trust was adopted by the Trust January 18, 1973, at a Special Meeting of the Board of Trustees thereof eliminating errors, correcting mistakes and making needed clarifications in order that the governing instrument of this Trust fairly and fully and clearly states the purposes and intent of the Trust. Jerre H. Paxton STATE OF WASHINGTONCOUNTY OF YAKIMA
ss. On this day personally appeared before me Jerre H. Paxton, to me known to be the individual described in and who executed the within and foregoing instrument, and acknowledged that he signed the same as his free and voluntary act and deed, *431 for the uses and purposes therein mentioned. Given under my hand and official seal this 22 day of January, 1973. The trustees and the certificate holders in IDT believed that the certificates of beneficial interest conveyed to the holders no more interest than a mere possibility of receiving disbursements of income or corpus from IDT at the sole discretion of the trustees. On June 14, 1971, the trustees of IDT authorized a distribution of $6,000 to the holders of certificates of beneficial interest not in proportion to their holdings, of which $1,500, the largest amount distributed, was distributed to Jerre Paxton. The following actions were initiated by Jerre Paxton as a trustee of IDT and agreed to by the other trustees: (1) the sale on February 21, 1969, to Kwik-Lok Yakima of U.S. Patent No. 3,270,872 and 3,270,873; (2) two purchases of silver bullion in 1969; (3) the purchase of lakefront property on Osoyoos Lake, Washington, in 1969; (4) two loans to Cenyak Corporation in 1970; (5) the purchase of and improvements to farm land near Willey City, Washington, in 1970; and, (6) the purchase of stock of General Birch Services Corporation in 1970. IDT owns none of the issued and *432 outstanding stock of Kwik-Lok Yakima. In a statutory notice of deficiency mailed to Floyd G. Paxton and Grace D. Paxton on February 26, 1976, the Commissioner determined for the taxable years 1969, 1970 and 1971 that, as grantors of PFT and IDT, Floyd G. Paxton and Grace D. Paxton were taxable on portions of the net income of those trusts because they retained the power to revest in themselves title to the corpus of the trusts (or any portions thereof) as well as retaining the power to hold, apply or distribute the income of the trusts for their benefit, referring to sections 676 and 677 of the Internal Revenue Code. OPINION Patent Issues
In January of 1965, Floyd Paxton was granted patents on end-to-end (U.S. Patent No. 3,164,249) and side-to-side (U.S. Patent No. 3,164,250) stripoks (herein sometimes referred to collectively as the stripolk patents). On April 15, 1965, he applied for patents on end-to-end and side-to-side closures with libels, which patents (respectively U.S. Patent No. 3,270,872 and U.S. Patent No. 3,270,873) (herein sometimes referred to collectively as the closure-with-label patents) were granted on September 6, 1966. On April 30, 1965, Floyd Paxton licensed *433 the striplok patents to Kwik-Lok Yakima, along with "all improvements heretofore or hereafter invented by [Floyd Paxton] and embraced by any of the claims of said patents." On the same day, Kwik-Lok Yakima granted to Kwik-Lok Indiana a non-exclusive license to use the methods covered by such patents along with the right to exploit "devices covered by said patents including devices embodying any improvements invested by Floyd G. Paxton and embraced by any of the claims of said patents." The parties have treated the two above-quoted clauses as functionally equivalent, and we will also treat them in that fashion. In July of 1968, Floyd Paxton assigned the closure-with-label patents to IDT, a family trust. On February 21, 1969, IDT sold such patents to Kwik-Lok Yakima for $5,000,000, payable over a 172-month period ending on August 5, 1983. On the same day, Kwik-Lok Yakima granted to Kwik-Lok Indiana an exclusive license, covering the District of Columbia and thirty-six eastern states, to exploit such patents. Kwik-Lok Indiana, as consideration for such license, agreed to pay, over the same 172-month period, $3,350,000 to Kwik-Lok Yakima. The parties herein disagree as to the correct *434 tax treatment of these transactions, concerning the closure-with-label patents. Petitioners claimed on their returns that the transfer of such patents from IDT to Kwik-Lok Yakima constituted a sale of capital assets, the recognized gain from which is taxable at capital gains rates. They contend that Kwik-Lok Yakima is entitled to amortize its cost of acquiring such patents. They also contend that the amounts paid to Kwik-Lok Yakima by Kwik-Lok Indiana under the licensing agreement of February 21, 1969, constituted ordinary royalty income to Kwik-Lok Yakima and deductible trade or business expenses to Kwik-Lok Indiana. Respondent, on the other hand, contends that the Kwik-Lok corporations received nothing in the February 1969 transactions to which they were not already entitled under the grants made in the April 1965 License and Sublicense Agreements. Based upon that conclusion, respondent would characterize Kwik-Lok Yakima's payments to IDT under the February 1969 agreement as ordinary income and would deny Kwik-Lok Yakima any amortization deductions with regard to the purported cost of acquiring the closure-with-label patents in 1969. Similarly, he would characterize Kwik-Lok *435 Indiana's payments to Kwik-Lok Yakima under the February 1969 agreement as dividend income (though he concedes that such dividends would constitute "qualifying dividends" under section 243(b)), and he would deny that such payments support a trade or business deduction for Kwik-Lok Indiana under section 162(a) because they were not "necessary." He further contends that, even if the Kwik-Lok corporations did not acquire their rights in the closure-with-label patents prior to the February 1969 transactions, the amounts paid for such patents at that time were excessive and, therefore, that to the extent of such excess, such payments were gratuitous. In order to decide these issues, we must determine whether the closure-with-label patents, which were the subject of the February 1969 transactions which respondent contends were superfluous, constitute "improvements [of, to, or on the striplok patents] heretofore or hereafter invented by [Floyd Paxton] and embraced by any of the claims of [the stripolk] patents." We are convinced that they are not. To laymen, and even to non-patent lawyers, the phrase "improvements * * * embraced by the claims of [the striplok] patents" seems rather broad *436 and amorphous. However, the word "claims," when used appropriately in the context of patents, is a term of art. Only by understanding the true import of the word "claims" can we intelligently identify the outer limits of the grants made in the above-quoted language in the License and Sublicense Agreements of August 1965.
Robert Baynham (herein Baynham), a patent lawyer of 15 years experience and the author of 200-300 patent applications, testified on behalf of patitioners that the "claims" of a patent are intended to define the metes and bounds of the exclusive rights which the patent gives the patentee. He explained that the language of a patent can be broken down into two essential parts--the specification and the claim or claims. The specification is a description of the invention and describes one embodiment of the patented invention. The claims are the meat of the patented invention. It is through the patenting of certain claims--and not the specification or particular embodiment which the patent describes--that the patentee receives protection of clearly defined rights. The relevant statutory case authority amply supports Baynham's testimony regarding the definition of a *437 patent "claim." For example, in Strumskis v. United States,200 Ct. Cl. 668, 675, 474 F.2d 623, 627 (1973), cert. denied 414 U.S. 1067 (1973), the court stated: This court has consistently maintained that the mates and bounds of an invention are defined by the claims of a patent and not its drawings or specification. In Super Products Corp. v. DP Way Corp.,546 F.2d 748, 756 (7th Cir. 1976), the court put it this way: "[T]he claim alone is the measure of the invention." The proper function of the claim was expressed in Wells Mfg. Corp v. Littelfuse, Inc.,547 F.2d 346, 351 (7th Cir. 1976): Since the claim made in the patent is the sole measure of the grant [citations omitted] a good starting point is an examination of the terms of the claim is issue. Another pertinent statement on the subject is found in Autogiro Co. of America v. United States,181 Ct. Cl. 55, 60, 384 F.2d 391, 395-396 (1967): The claims of the patent provide the concise formal definition of the invention. They are numbered paragraphs which "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." 35 U.S.C. [sec.] 112. It is to these wordings that one must *438 look to determine whether there has been infringement. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them. * * * It is plain that the concept of a patent claim is legal in nature. Each patent claims certain aspects of the subject invention and provides protection with respect to those features. Since the measurement of what was transferred by the language in question in the April 1965 License and Sublicense Agreements is determined by the claims of the striplok patents, it is necessary to inquire into the scope of the claims of those patents. Petitioners introduced testimony by two experts regarding the claims of the striplok patents. Baynham, whom we referred to above, first testified that, after examining the words of the two striplok patents, he concluded that there were three distinct elements to the claims of those patents: 1) the stiffness of the material of which the striploks were made; 2) the design of the bag-receiving opening; and 3) the narrow, frangible webs connecting the closures. *439 In the following passage of testimony, he emphasised the webbing: The third, and most important element in the claim, in my opinion, are the interconnection between the closures, which are narrow webs, in one of the patents, they're referred to as narrow web means, but they are frangible elements, so that they will break, and the intent, in the breakage, is to get a shearing which leaves the edge of each closure very smooth, so that somebody handling these does not get jagged. Petitioners' other expert witness was Professor Donald Chisum (herein Chisum), the author of a multi-volume treatise on patent law and a well-known patent law expert who was then on the University of Washington Law School faculty. In his opinion, the claims of the striplok patents were limited to the particular means claimed for joining bag closures in strip form, i.e., the frangible webs. He obtained this narrow construction of the striplok patents by analyzing the file wrapper and invoking the doctrine of file wrapper estoppel. We cannot improve upon the following definition and explanation of these terms: The file wrapper contains the entire record of the proceedings in the Patent Office from the first application *440 papers to the issued patent. Since all express representations of the patent applicant made to induce a patent grant are in the file wrapper, this material provides an accurate charting of the patent's pre-issuance history. One use of the file wrapper is file wrapper estoppel, which is the application of familiar estoppel principles to Patent Office prosecution and patent infringement litigation. The patent applicant must convince the patent examiner that his invention meets the statutory requirements; otherwise, a patent will not be issued. When the application is rejected, the applicant will insert limitations and restrictions for the purpose of inducing the Patent Office to grant his patent. When the patent is issued, the patentee cannot disclaim these alterations and seek an interpretation that would ignore them. He cannot construe the claims narrowly before the Patent Office and later broadly before the courts. File wrapper estoppel serves two functions in claim interpretation; the applicant's statements not only define terms, but also set the barriers within which the claim's meaning must be kept. These results arise when the file wrapper discloses either what the claim *441 covers or what it does not cover. [Autogiro Co. of America v. United States, 181 Ct. Cl. at 64-65, 348 F.2d at 398-399; footnotes omitted.] See also, Dwyer v. United States,174 Ct. Cl. 1064, 1073, 357 F.2d 978, 984 (1966), where the court said: It is well settled that patent claims are interpreted in light of the prosecution history, and that where the applicant has narrowed his claims in order to obtain the allowance thereof, the limitations recited or argued cannot be disregarded in an infringement action. * * * As the Supreme Court said in a case involving file wrapper estoppel, the matter given up (by the amendment), "must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed against him." Exhibit Supply Co. v. Ace Patents Corp.,315 U.S. 126, 137 (1942). Chisum elaborated on the doctrine, explaining that it "operates to preclude a patent owner from obtaining, through subtle means of construction of claim language, a resurrection of subject matter that he, in effect, surrendered during the course of [the] proceedings to obtain the patent." He further pointed out that, "the most typical situation where file *442 wrapper estoppel would apply is where the claims are rejected as too broad in the light of the prior art, to which the applicant responds by narrowing his claims * * *." Of course, that is exactly what happened here. Both of the applications for striplok patents, especially the first one (which provided some guidance in amending the second), were substantially amended. Many claims were withdrawn, and only the narrow claim language set forth in the findings of fact ultimately survived. Thus, as a principle of construction, the doctrine of file wrapper estoppel constrains us to closely circumscribe the breadth of the claims of the striplok patents. Moreover, there is a well-established principle in the construction of agreements dealing with patent transfers: "future improvements" clauses are to be narrowly construed. To construe such provisions less than strictly is regarded as against public policy because it has the effect of tying up an individual's productive creativity. For example, note the following from White Heat Products Co. v. Thomas,266 Pa. 551, 109 A. 685, 686 (1920): Where the product of an inventive mind is sought to be appropriated under an agreement to assign to *443 another, the language of the agreement must be clear and show an unmistakeable intention that the particular matter covered by the invention of patent is within the intention of the parties * * *. This principle receives regular reiteration in the case law. For example, in DeLong Corp. v. Lucas,176 F.Supp. 104, 127 (S.D.N.Y. 1959), affd. 278 F.2d 804 (2d Cir. 1960), cert. denied 364 U.S. 833 (1960), the court stated: The law does not look favorably upon covenants which place "a mortgage on a man's brain, to bind all its future products." Again, in Mullins Mfg. Co. v. Booth,125 F.2d 660, 663 (6th Cir. 1942), the principle was stated in the following manner: Courts of equity are loathe to give their aid by construction to a contract, the enforcement of which will constitute a mortgage for life on the inventor's brain, and bind all his future products. * * * Judge Learned Hand put it correctly and succinctly when he wrote, in American Cone and Wafer Co. v. Consolidated Wafer Co.,247 Fed. 335, 336 (2d Cir. 1917), "[I]f the purpose is so broad, the language must not be so vague." Using this maxim of narrow construction, the doctrine of file wrapper estoppel, and the testimony of *444 petitioners' two expert witnesses, we find, based upon the facts before us, that the claims of the striplok patents are those relating to the stiffness of the closure device material, the location and shape of the bag opening, and the frangible web means for interconnecting the closure devices. The critical invention to those patents is the web means. Having so decided, we must determine whether, assuming that the closure-with-label patents were "improvements" of, to, or on the stripolk patents, such improvements were "embraced by any of the claims of [the stripolk] patents." The parties agree that the word "embraced" is not a term of art. Therefore, even though Baynham and Chisum expressed opinions about whether the closure-with-label patents were embraced within the claims of the striplok patents, their opinions are not entitled to any special weight. The word "embrace," in this context, means to encircle or enclose. It is clear to us, as it was to the Baynham and Chisum witnesses, that the basic invention in the claims allowed in the closure-with-label patents was the means of attaching labels in a feathered fashion to bag-closing devices united in strip form such that the *445 bag-closing devices could be coiled, stored and thereafter applied without any interference with the application process due to the presence of the labels. With regard to such patents, the point is that the precise nature of the strip to which the labels are attached is not critical to the nature of the invention described in the claims of the closure-with-label patents. For example, if labels were attached in a feathered fashion to strips of bag-closing devices connected by means other than the web-means method, which is in the crux of the striplok patents, presumably such attachment method would be covered by the closure-with-label patents. The basic thrust of the striplok patents is bag closing; the basic thrust of the closure-with-label patents is labeling. The claims of the closure-with-label patents do not coact with or improve any of the essential elements (closure stiffness, bag-grasping opening, and web means of connection) of the claims of the striplok patents. Thus, the invention covered by the closure-with-label patents is not embraced by, encircled within, or enclosed by any of the claims of the striplok patents. Moreover, it is not entirely certain whether the closure-with-label *446 patents are "improvements" that would come within the granting language of the April 1965 License and Sublicense Agreements. Can it rationally be said that the closure-with-label patents "improve" the striplok patents?They in no way change or alter, let alone "improve," the basic elements of the striplok patents, i.e., the stiffness of the closures, the design of the opening, or the means of connecting the bag-closing devices. Furthermore, though it is conceded that the closure-with-label patents are an improvement on the striplok patents, it is doubtful that the former is an improvement to the latter. This distinction is not without significance, as Judge Learned Hand said in American Cone and Wafer Co. v. Consolidated Wafer Co.,supra at 336, "Every more efficient machine would be an improvement 'upon' it, in common speech, but not 'to' it." The language in the License and Sublicense Agreements is ambiguous on this point, though, if put to a choice, we would probably construe the grant to encompass only improvements "to" the striplok patents. Because of our construction and application of, and decision relating to, the "embraced by the claims, etc." limitation in such granting *447 language, we need not wrestle with the semantical details of the term "improvements." Respondent cites, without discussion, the following cases in support of his position: Thomas Flexible Coupling Co v. Commissioner, B.T.A. Memo. 1944-190, affd. 158 F.2d 828 (3d Cir. 1946); [6]BestLock Corporation v. Commissioner,29 T.C. 389 (1957), on rehearing 31 T.C. 1217 (1959); Dry Ice Corporation of America v. Josephson,43 F.2d 408 (E.D.N.Y. 1930). Those cases are distinguishable; none of the assignments involved in them contained the limiting language "embraced by the claims * * *", the construction of which is the crux of our decision herein. The obvious intent of the participating parties to the August 1965 License and Sublicense Agreements corroborates our finding that the closure-with-label patents are not improvements embraced by the claims of the striplok patents. There are many facts which indicate such intent. One of the most compelling of these is the fact that the potential closure-with-label patents were readily identifiable on April 30, 1965. *448 If Floyd Paxton had contemplated that the closure-with-label invention be included in the grant embodied in the License and Sublicense Agreements, they could have been, and presumably would have been, specifically identified by: (1) the titles or descriptions of the inventions for closures-with-labels; (2) the date on which applications for patents on such inventions were signed; (3) the application serial numbers and the filing dates with the U.S. Patent Office; and (4) the office docket numbers used by Mr. Keech to identify such inventions. Obviously, there was no dearth of techniques by which such inventions could have been identified if Floyd Paxton had desired to transfer them. If he had specifically instructed Mr. Keech to include in the April 30, 1965, License Agreement a right to exploit the closure-with-label inventions, surely Mr. Keech would have done so, using one or all of the above-listed identifying numbers, descriptions, or dates. We can only conclude from the omission of any specific reference to such inventions in either the License or Sublicense Agreements of April 1965 that they were not intended to be included within the transfer accomplished by such Agreements. *449 Respondent would have us draw negative inferences from the fact that the Kwik-Lok corporations utilized the closure-with-label patents from September 6, 1966, to February 21, 1969, and paid royalties under the April 1965 Agreements based upon the total sales price of striploks with labels attached using such patented process, without actually owning the exploitation rights to such closure-with-label patents during such period. Calculating the royalty owed under the April 1965 Agreements attributable to the sale of striploks with labels attached, per the process claimed in the closure-with-label patents, based upon the full sales price received from the sales of striploks with labels attached is exactly what is required by such Agreements. The inferences that we draw from this evidence are ambivalent, and certainly do nothing to negate our construction of the plain words of the controlling documents. Finally, respondent argues that, because Floyd Paxton did not reimburse Kwik-Lok Yakima for some legal expenses incurred in the acquisition of the closure-with-label patents until September 1968, Kwik-Lok Yakima must have been the true owner of such patents. But Floyd Paxton did personally *450 pay such expenses immediately after Kwik-Lok Yakima requested payment for such. Though petitioners offer several plausible explanations for the two-year delay in billing Floyd Paxton, we are minimally concerned with the whole scenario. We can draw no inferences from the whole fee payment course of events that comes close to upsetting our legal and factual determination that the closure-with-label patents are not "improvements * * * embraced by any of the claims of [the striplok] patents." We now turn to the second issue; i.e., the reasonableness of the payments for the closure-with-label patents. IDT sold the closure-with-label patents to Kwik-Lok Yakima on February 21, 1969, for a total of $5,000,000 payable in 172 monthly installments of $28,901 each, commencing April 5, 1969, with a final payment of $29,028 due August 5, 1983. Based on the Inwood Method of ascertaining present value, using a 15 percent interest rate, the parties agreed that the discounted present value on February 21, 1969, of the payments due pursuant to such sale was $2,006,480. Respondent determined that the closure-with-label patents were worth only $750,000 on that date and, therefore, that the excess of *451 $2,006,480 over $750,000 constitutes taxable ordinary income, as opposed to capital gain, to the recipient of the payments, IDT.The parties make parallel arguments with regard to the License Agreement by which Kwik-Lok Yakima granted Kwik-Lok Indiana a non-exclusive right to exploit such patents in the District of Columbia and 36 eastern states. Our decision regarding this transfer depends solely upon our decision concerning the transfer from Kwik-Lok Yakima. Therefore, we must determine whether the sales price agreed to by IDT and Kwik-Lok Yakima was reasonable. We find that it was. We emphasize at the outset, because it is upon this point that respondent's valuation founders, that in determining value as of a certain date, it is obviously unsound to treat subsequent data as if it were known at that time. Ithaca Trust Co. v. United States,279 U.S. 151 (1929). The crux of the valuation issue is what the parties to the transaction thought and expected at the time the sale of the closure-with-label patents were effected. This fundamental principle of valuation is stated as follows in National Water Main Cleaning Co. v. Commissioner,16 B.T.A. 223, 239 (1929): In determining value *452 on March 1, 1913, it is obviously unsound to treat subsequent data as if they were known at that time. Ithaca Trust Co. v. United States,279 U.S. 151. At any date the future can only affect value to the extent that it is reasonably and sensibly in contemplation. Human experience rarely follows with exactness its own expectations. We must determine "what it fairly may be believed that a purchaser in fair market conditions would have given for [the patents] in fact--not what [we] may think a purchaser would have been wise to give." New York v. Sage,239 U.S. 57, 61. To take subsequent earnings as disclosing prior value would ignore the obvious factor of risk inherent in commercial values.The hypothetical willing seller and buyer, who are by judicial decree always dickering for price in the light of all the facts, can not be credited with knowing what the future will yield. Otherwise the owner with a successful future would ordinarily not sell, and without it could find no buyer; and thus the entire hypothesis of a voluntary transaction is destroyed and we are left without the prescribed judicial standard. It is the inability to know the future which gives play to the judgment of *453 risk, and this in turn contributes an element of the value arrived at. The evidence to be considered consists of the historical facts prior to March 1, 1913, and reasonable prognostications on that date. James Couzens,11 B.T.A. 1040; Van Kannel Revolving Door Co.,11 B.T.A. 1209; Oahu Sugar Co., Ltd.,13 B.T.A. 404; Cuyahoga Mortgage Co.,14 B.T.A. 1. With this in mind, we will examine the evidence of the value of the closure-with-label patents as of February 21, 1969. A general understanding of what the ability to fasten labels to bag-closing devices was expected to do for Kwik-Lok Yakima is crucial to any estimation of the value of the closure-with-label patents. Kwik-Lok Yakima had, at the time it acquired the closure-with-label patents, the capability of automatically applying bag-closing devices to the necks of plastic bags. This had been a long and slow developmental process--from the single, unpatented bag-closing device (single lok) to a strip of closures with sufficient frangibility to permit individual closures to be applied automatically at a rate of up to 120 per minute. The capability which Kwik-Lok possessed, as a result of holding the striplok patents, put it in *454 a strong competitive position vis-a-vis the other closing methods on the market at that time, i.e., heat seal, staple, tape and wire tie. As shown by the following chart which Jerre Paxton prepared during his testimony, the product covered by the striplok patents was the only one which possessed all of the commercially positive characteristics of reusability, capability of being applied both automatically and semi-automatically, and compatability with metal detection devices: Means of Plastic Bag Closing
Kwik-Lok
Bag-Closing
Qualities or Capabilities
Heat Seal
Staples
Wire Ties
Tape
Devices
Reusability
x
x
Semi-automatic application
x
x
x
x
x
Fully automatic application
x
x
x
x
x
Labeling capability with
semi-automatic application
* L
x
Labeling capability with
fully automatic application
x
Metal detection compatability
x
x
x
Pricing and coding capability
* L
x
x
Despite this preeminence, the Kwik-Lok system lacked the ability to apply closures with labels. If Kwik-Lok Yakima could acquire the capability of automatically applying closures with labels, it would have a product capability possessed by no other bag-closing device. As Jerre Paxton pointed out, the capability of being able to apply a label *455 to a closure was extremely important insofar as net bags (which "were used overseas and starting to come into this country") were concerned. Labels were necessary because, as Jerre Paxton testified, "you can't print on a net bag, as you can on a flexible, polyethylene bag." Aside from the capability of bringing to the net bag some sort of space for a printed message (not otherwise available on a net bag), possession of the ability to attach labels in a feathered fashion to a strip of bag-closing devices would also permit the use of late-breaking information ("at the point of closing," in Jerre Paxton's words) so as to permit data and information about "specials, discounts, couponing." As Jerre Paxton pointed out, the polyethylene bag is "pre-printed." "[W]hen * * * special considerations come up," a label allows a message to be attached "immediately" to the pre-printed bag "without disturbing [the] normal package design." The significant advantage which this would give to Kwik-Lok Yakima insofar as holiday specials has been demonstrated by the evidence herein. With this understanding of the importance of labeling, we can see that Kwik-Lok Yakima was justifiably optimistic about the *456 potential profits to be gained from the use of the closure-with-label patents. Moreover, as Jerre Paxton pointed out, there was probably no better judge of the value of such patents than the officers and employees of Kwik-Lok Yakima. No one had their experience or expertise in the very market which they would be exploiting. Thus, they justifiably decided not to seek any outside appraisal of such patents at the time of the sale. Several factors pointed to a potentially enormous market for the closures with labels. The production of polyethylene film (used for plastic bags) in the United States had increased from 183 million pounds in 1958 to 613 million pounds in 1965 and was expected to increase to 720 million pounds in 1968. The ability of Kwik-Lok Yakima to provide an entire bag-closing system (striploks, closures with labels, and machine to apply both) could reasonably be expected to place it in a very strong competitive position. By the time the patents on the various items lapsed, Kwik-Lok Yakima fully expected to have established a market strength that would enable it to enjoy a competitive advantage even after the patent protection expired. Furthermore, it was fully expected *457 that the sales of closures with labels would equal or exceed, quantitatively, the sales of striploks. With the increased demand for closures with labels indicated by these factors also came an expectation of disproportionately greater profits on the sale of such. Kwik-Lok Yakima already possessed the capacity to manufacture and market the closures with labels. More importantly, it had found, as a result of its test manufacturing and selling of closures with labels, that the gross profit (sales proceeds less costs of production) on closures with labels ($3.175 per thousand) was significantly greater than the gross profit on striploks ($ .60 per thousand). Also, Kwik-Lok Yakima reasonably expected the sales of closures with labels to lead to increases in its sales of the high-markup equipment needed to apply such closures. All of these factors point to a reasonable expectation of great returns from the purchase of the closure-with-labels patents. As an illustration of the potential value solely from the increased sales of closures with labels, petitioner provided an example similar to the following of an income projection that would have been reasonable based upon the facts and expectations *458 existing and known on February 21, 1969. Kwik-Lok Yakima sold an aggregate number of units (1,000 individual closures comprise a unit) in its fiscal year ending March 31, 1968, of approximately 1,899,402. [7] Assuming static sales and assuming that closures with labels capture only one-fourth of that static market (both of which assumptions are very conservative given the facts and reasonable expectations at the time the closure-with-label patents were sold), Kwik-Lok Yakima could expect to sell 474,850 units of closures with labels annually. Assuming no significant additional marketing expenses, which is reasonable in light of its established marketing network, Kwik-Lok Yakima's net profit on the sale of that many striploks would have been $251,077. [8] Its net profit from the sale of the same number of closures with labels, however, would have been $1,018,996. [9] Thus, by substituting sales of closures with labels for sales of striploks, Kwik-Lok Yakima could increase its yearly bottom-line profits by $767,919 ($1,018,996 minus $251,077). Multiplying that by the agreed-upon Inwood discounting factor of 5.7855, the present value of a stream of such increased profits would have been *459 $4,442,795, which is well in excess of the $2,006,480 present value of the payments which Kwik-Lok Yakima is required to make under the license agreement of February 21, 1969. *460 It is true that Kwik-Lok Yakima did not actually experience economic success on a level comparable to the expectations. Based primarily on such post-transfer facts, respondent prepared a valuation report to quantify the value of the closure-with-label patents on February 1969. Engineer Revenue Agent Jerry Crawford, who is not an engineer and has had no particular experience with valuing patents, but rather has had extensive real estate appraisal experience, analyzed solely the expected royalty income stream which could be expected by the transferor IDT. He ignored the potential profits which Kwik-Lok Yakima expected to make. He further ignored any value attributable to profits derived from sales of related products or from the expected preeminent market position at the end of the patent protection periods. All in all, we find Agent Crawford's valuation report to consist mainly of valuation boilerplate. Patents are valued differently from real estate.It is respondent's failure to realize this distinction that weakens the probative value of Agent Crawford's report. We are convinced that the closure-with-label patents were reasonably valued by the parties on February 21, 1969, *461 at $2,006,480. That being the case, the valuation given to the rights of exploitation which were the subject of the License Agreement of the same date between Kwik-Lok Yakima and Kwik-Lok Indiana was reasonable. Therefore, the transfers of closure-with-label patents on February 21, 1969, had substance and were for adequate consideration. The amounts paid to IDT are capital gain (except for the interest components thereof). Kwik-Lok Yakima may amortize all of its cost of such patents. The amounts paid to Kwik-Lok Yakima are ordinary royalty income to Kwik-Lok Yakima and deductible trade or business expenses to Kwik-Lok Indiana. Grantor Trust Issues
The threshold question which must first be resolved as to PFT is whether the doctrine of collateral estoppel applies.Respondent amended his answers in docket Nos. 4639-76 and 4644-76 to allege that petitioners in those cases were collaterally estopped to deny that PFT was a grantor trust and its income is taxable to such petitioners as grantors because that issue has previously been litigated in this Court. This is new matter; therefore the burden of proof is upon respondent.Rule 142(a), Tax Court Rules of Practice and Procedure.
On *462 February 15, 1972, we filed our opinion in Paxton v. Commissioner, which was reported at 57 T.C. 627 and affirmed 520 F.2d 923 (9th Cir. 1975). The primary issue in that case (hereinafter referred to as the "first case" or the "first proceeding") was whether petitioners were taxable in the taxable year 1967 on the income earned by PFT to the extent of their interest in the trust by virtue of PFT being a grantor trust under the provisions of sections 671 through 677. The adjustment to petitioners' income in the first case was described as follows in the statutory notice of deficiency which the Commissioner mailed to them: It is determined that as grantor of the F. G. Paxton Family Trust you are taxable on the net income thereof for the period 10/1/67 to 12/31/67 because you have granted a non-adverse party a power to revoke. Your taxable income is increased by $6,413.05 represented by constructive dividends received by the Trust from the wholly owned corporation Kwik-Lok Corporation (Yakima). Prior to the creation of PFT Floyd G. Paxton and Grace D. Paxton owned 86.38 percent of Kwik-Lok Yakima and they likewise owned 86.38 percent of PFT; therefore, in the first case the Commissioner *463 sought to tax to them only the portion of the net income of PFT represented by the portion of PFT which the Commissioner determined was owned by them. The facts in the first case were fully stipulated. We held that Jerre Paxton, son of Floyd g. Paxton and a trustee of PFT, was not an adverse party. At that time he owned 3.84 percent of the trust. "His interest in the trust, whether regarded as substantial or insignificant, would not be adversely affected by the exercise or nonexercise of the power he possesses with respect to the trust." 57 T.C. at 632. We, therefore, held that petitioners must be treated as the owners of 86.38 percent of the trust under section 676(a) and taxed with that portion of the trust income for the taxable period before the Court. We likewise held that petitioners must be treated as owners of 86.38 percent of the trust under section 677. The Court of Appeals in affirming our decision explained its holding as follows at page 927 of 520 F.2d: For a sole remainderman, each dollar of trust corpus revested in the grantor costs a dollar. His adversity is as strong as the grantor's advantage, so that we may fairly say his decision is beyond the grantor's *464 control. The statute's presumption that a trustee with discretion will be amenable to the grantor's wishes has been overcome. From this paradigm of adversity we slide, however, to Jerre Paxton's 3.84%. Each dollar given away costs him less than four cents. So slim a restraint upon the power to distribute income and assets of the trust to the Paxtons is not sufficient to protect them from all tax whatsoever. Jerre Paxton is adverse not as to the entire trust but only as to his share. Treas. Reg. [sec.] 1, 672(a)-1(b). Without setting out a formula for acceptable percentages, we can affirm as not clearly erroneous the Tax Court's finding that Jerre Paxton is not an adverse party. [Fn. ref. omitted.] The statutory notices of deficiency mailed to petitioners in the instant case added the PFT income to their income for the taxable year 1971 with the following explanation: As grantor of the F. G. Paxton Family Trust, you are taxable on the net income thereof to the extent of your interest therein which is 86.38 percent in the amount of $15,382.62 for the tax year 1971 because you have retained the power to revest in yourself title of the corpus of the trust (or any portion of it) *465 as well as retaining the power to hold, apply or distribute the income of the trust for your benefit. (See Sections 676 and 677 of the Internal Revenue Code.) The landmark case on the doctrine of collateral estoppel is Commissioner v. Sunnen,333 U.S. 591 (1948).The Court held at pages 599-600 that collateral estoppel-- must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. Petitioners contend that collateral estoppel is not applicable here because the facts have changed from those involved in the first proceeding and because the issues involved in the two proceedings are not identical. In the prior proceeding Jerre Paxton, the son of Floyd G. Paxton, one of the grantors, owned 3.84 percent of PFT but in the instant proceeding his interest had increased to 9.9 percent. In deciding the issue in favor of the government in the first case, as set forth above, we did not base our holding upon the size of Jerre Paxton's ownership of the trust. However, as demonstrated by the quotation above, the Court of Appeals seemed *466 to base its affirmance of our decision on the size of Jerre Paxton's interest. In applying the rationale of Commissioner v. Sunnen,supra, therefore, should the test of the identity of controlling facts be applied to the holding of the trial court only or should it be applied to the holding of the court of appeals as well? Keeping in mind that an appeal in the instant case lies in the court of appeals which affirmed our holding in the first case, we conclude that the identity of controlling facts test should be applied to the first proceeding in its entirety, including the holding of the court of appeals. Accordingly, we hold that respondent has failed in his burden of establishing that the doctrine of collateral estoppel applies. In view of this holding it is not necessary for us to decide for this purpose whether "clarifications" of the trust instrument of PFT represents a change in the controlling facts nor whether the issues in the two proceedings are identical. It is, however, necessary to decide precisely the issue presented to the Court with respect to PFT. Petitioners point to the language of the statutory notices of deficiency quoted above and argue that the issue is *467 whether petitioners grantors retained any power to revest in themselves title to the corpus of the trust or any power to hold, apply or distribute the income of PFT for their benefit. Respondent contends that the issue in the instant proceeding is no different from the issue in the prior proceeding, i.e., whether the power to revoke PFT was granted to a nonadverse party, Jerre Paxton. Petitioners further argue that the issue of whether Jerre Paxton holds a substantial interest adverse to that of the grantors of PFT is a new theory not covered by the pleadings and is inconsistent with his determination of the deficiencies citing Tauber v. Commissioner,24 T.C. 179, 185 (1955), and Estate of Horvath v. Commissioner,59 T.C. 551, 556 (1973). Respondent counters with reference to our Rule 41(b) which provides that when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Petitioners' pretrial memorandum cast the PFT issue in broad terms but, nevertheless, emphasized the changes in the trust instrument which occurred after the first case was decided.Respondent's trial *468 memorandum stressed the importance of Jerre Paxton's role in the trust as not being adverse. Petitioners voiced no objection to the manner in which respondent framed the PFT issue. In his opening statement counsel for petitioners described the PFT issue in terms of the first proceeding and upon questioning by the Court stated that petitioners contend that Jerre Paxton held a substantial adverse interest in PFT and, therefore, that the grantor trust provisions were inapplicable. The foregoing amply demonstrates that from the beginning of the trial counsel for petitioners understood the PFT issue to be whether Jerre Paxton held a substantial adverse interest in PFT. Such a finding renders the decisions in Tauber v. Commissioner,supra, and Estate of Horvath v. Commissioner,supra, distinguishable. Rubin v. Commissioner,56 T.C. 1155 (1971), affd. per curiam 460 F.2d 1216 (2d Cir. 1972). Accordingly, we hold that the PFT issues before the Court in this proceeding include the question of whether Jerre Paxton held an adverse interest. PFT was created by Declaration of Trust executed on August 3, 1967, with Floyd G. Paxton as creator (grantor) and Jerre H. Paxton and Lorne House as *469 trustees. It was filed with the Auditor of Yakima County, Washington, on October 5, 1967. The grantor did not, in the trust instrument, reserve the power to alter, amend, or revoke the trust, nor was such power granted to the trustees. On October 25, 1969, the trustees of PFT, purported to "correct, nunc pro tunc," the declaration of trust of PFT by amending paragraph NINTH to provide that upon dissolution of the trust its assets would be distributed exclusively to an organization which qualified under section 501(c)(3) of the Internal Revenue Code. On May 30, 1972, a re-typed version of the Declaration of Trust of PFT was executed by Floyd G. Paxton as creator and Lorne House, Jerre Paxton, James B. Schrader and Diane Irwin as trustees. It was filed with the Auditor of Yakima County, Washington, on June 5, 1972. Attached to the declaration of trust and likewise filed with the county auditor was a document acknowledged before a notary public entitled "Restatement Declaration of Trust of This Constitutional Trust" in which Jerre Paxton stated that the Board of Trustees of PFT adopted the "Restatement of Declaration of Trust" of PFT at a special meeting on May 30, 1972, for "eliminating *470 errors, correcting mistakes and making needed clarifications in order that the governing instrument of this Trust fairly and fully and clearly states the purposes and intent of the Trust." Petitioners make their arguments regarding PFT based upon PFT as "clarified" by the action taken by the trustees on October 25, 1969, and the "Restatement of Trust" dated May 30, 1972. Respondent bases his arguments upon the original PFT Declaration of Trust executed on August 3, 1967, and argues that the action of the trustees on October 25, 1969, and the "clarification" of May 30, 1972, were ineffective to alter the terms of the PFT Declaration of Trust. The parties agree that Floyd G. Paxton did not retain the power to amend the trust. The declaration of trust does not explicitly grant to the trustees the power to amend the trust.
Paragraph NINTH of the original declaration of trust of PFT provides that upon dissolution that, "The Trust shall be proportionately and in a pro rata manner distributed to the beneficiaries." On October 25, 1969, the trustees purported to "clarify" that provision by providing that upon dissolution the trust shall be distributed exclusively to one or more charitable, *471 religious, scientific, literary or educational organizations, as selected by the trustees, which would then qualify under the provisions of section 501(c)(3) of the Internal Revenue Code. Petitioners argue that the language which the trustees sought to change was ambiguous and the substituted language was designed to clarify the terms of the instrument to conform to the original intent of the grantor. Respondent disagrees. Petitioners contend that there are numerous "beneficiaries" of PFT; therefore, paragraph NINTH before the October 25, 1969, action of the trustees is unclear as to whom the assets should be distributed upon dissolution. The declaration of trust provides for grants and donations to educational, scientific and religious institutions and to the holders of the certificates of interest. Both the charitable organizations and the holders of the certificates of interest are, therefore, beneficiaries. The language of paragraph NINTH requiring the assets distributed upon dissolution to be pro rata and proportionate could refer only to the holders of the certificates of interest because the charitable organizations are not listed. The first preamble of the declaration *472 of trust expresses responsibilities to friends, relatives and employees as well as charitable institutions. The holders of certificates of interest are members of the Paxton family and one employee of Kwik-Lok Indiana and his wife. Petitioners point out that paragraph FIFTH of the declaration of trust provides that "the holders of Certificates of Interest shall have no right, title or interest in or to any portion of the Trust Estate" and paragraph SIXTH provides that "[n]one of the holders of Certificates of Interest, present or future, have or possess any beneficial interest in property or assets from time to time constituting all or any portion of the Trust Estate." Such provisions appear to us to be in the nature of "spendthrift" provisions rather than provisions designed to identify the beneficiaries. Such language is frequently included in trust instruments to emphasize that the trust assets are being held in trust and the trustees in such capacity have the only interest in the assets. It is implied that the charitable organizations have no interest in the trust assets because they are not named in the declaration of trust and the trustees have sole discretion in making grants *473 to such organizations. We conclude, therefore, that the holders of the certificates of interest are beneficiaries and the action taken by the trustees on October 25, 1969, to limit distributions in liquidation to organizations qualifying under section 501(c)(3) was not a clarification but, instead, a substantive amendment to the declaration of trust changing its terms, which they had no authority to take. Petitioners hypothesize about the forms of legal actions which various parties might institute to construe paragraph FIFTH and then conclude that the trustees have done nothing more than a court would have done in ascertaining the grantor's intent in interpreting the various provisions of the declaration of trust. The trustees cannot amend a declaration of trust when they have no power to do so even though the results of an appropriate legal action might conceivably coincide with the trustees' interpretation. We do not agree with the construction implemented by the trustees on October 25, 1969, and hold that they have attempted to amend rather than clarify and that this attempt was a nullity. On May 30, 1972, the trustees and Floyd G. Paxton executed a restatement of the declaration *474 of trust of PFT. In this version of the declaration of trust the assets upon dissolution of the trust were to be distributed exclusively to charitable organizations. For the reasons expressed above as to the October 25, 1969, action of the trustees, we likewise hold that this change was an amendment to the declaration of trust which was beyond the power of the grantor and trustees and was, therefore, in that respect, a nullity. We agree with respondent that paragraph FIFTH of the declaration of trust of PFT which is applicable to the issues presented here is the version contained in the original declaration of trust which was executed on August 3, 1967. The May 30, 1972, version of the declaration of trust contains some other significant amendments which we hold to be ineffective. The trustees attempted to confer upon themselves the power to amend the declaration of trust. This power was never granted to them in the declaration of trust executed on August 3, 1967.In addition, when the trustees and Floyd G. Paxton adopted the restatement of the declaration of trust on May 30, 1972, they omitted the sole discretionary power of the trustees to "make any distribution of income from *475 the operation of the Trust Estate and make any distribution of all or any portion of the assets comprising the Trust Estate for any reason to the holders of Certificates of Interest in the Trust." Because paragraph NINTH of the original declaration of trust specified that upon dissolution of the trust that its assets would be distributed proportionately and in a pro rata manner to the beneficiaries, it appears to us that interim distributions of the assets of the trust to the "holders" (plural in the original declaration of trust) would imply pro rata distributions. Otherwise, the language of paragraph NINTH requiring pro rata distribution upon liquidation could easily be circumvented by a series of partial liquidations to only one of the holders of a certificate of interest. Deleting the power to make distributions of assets of the trust to the holders contained in paragraph NINTH was a substantial change in the terms of the trust which deprived the holders of the certificates of interest to pro rata distributions of assets of the trust. Petitioners argue that Floyd G. Paxton did not retain the power to amend the trust.If not, then the May 30, 1972, amendment was made by the trustees *476 who had no authority to amend the trust. We conclude that this change was a nullity. Petitioners point to various facts established in this proceeding which were different from those presented in the first proceeding. In the taxable year before us now, Jerre Paxton held a 9.90 percent interest in PFT. In the prior proceeding he held a 3.84 percent interest. We did not base our holding in the first proceeding upon the size of Jerre Paxton's holding in PFT and, therefore, cannot see how the change in the size of Jerre Paxton's holding should require a result different from the one we reached in the first proceeding. However, if we adopted the rationale of the Court of Appeals in the first proceeding, we would conclude that a 9.90 percent ownership was not substantial. In addition, petitioners point to the action of the trustees taken on August 4, 1967, in naming Jerre Paxton as "First Trustee," giving him sole veto power over the actions of the other trustees. Petitioners argue that such power coupled with the power to distribute all of the assets of the trust to the holders of the certificates of interest non pro rata makes his interest adverse to that of the grantor, Floyd *477 G. Paxton. We disagree. The action by the trustees Jerre Paxton and Lorne House in naming Jerre Paxton as "First Trustee" with absolute veto power was done without any explicit authority contained in the declaration of trust. It amounted to nothing more than Lorne House's relinquishing part of his authority as a trustee. It would seem that if the trustees could grant an exclusive veto power to a single trustee without specific authority in the declaration of trust, then they could likewise withdraw such authority, and the relinquishment of powers by an acting trustee would not operate to deprive a future trustee of such power. Article FIFTH of the original declaration of trust provides that the trustees may, in their discretion, distribute any income and any or all of the assets of the trust to the holders of the certificates of interest. Petitioners argue that Jerre Paxton could distribute to himself all of the assets of the trust estate under paragraph Fifth of the declaration of trust; yet petitioners, in other parts of their argument, rely upon the May 30, 1972, version of the trust as being the governing instrument but that version contains no such provision. We find the *478 original declaration of trust of PFT to be a very curious instrument. After considering all of the evidence in this case we conclude that the interested parties made two abortive attempts to clean it up and that the trustees' actions were mere "window dressing" to create the illusion that Jerre Paxton held an interest that was substantially adverse to that of the grantor, Floyd G. Paxton. After all of the smoke dissipates, however, we perceive the interest of Jerre Paxton in PFT to be not materially different than it was when we decided the first case. Therefore, we hold that petitioners are taxable on the income of PFT for the taxable year 1971. We turn now to the question of whether the income of IDT is taxable to the grantors. IDT was not involved in the first proceeding before us. Therefore, the doctrine of collateral estoppel is not involved in the IDT trust issue. The issue of the taxability of income from IDT to the grantors is identical with that same issue as to PFT but the similarity ends there. The issue is simply whether Jerre Paxton held a substantial interest adverse to that of the grantors. The declaration of trust of IDT differs materially from the declaration *479 of trust of PFT. In the case of IDT the original declaration of trust granted to the trustees the unlimited power to amend the declaration of trust. The trustees had the unlimited power to distribute to any certificate holder any or all of the income or assets of the trust. Jerre Paxton was a certificate holder. On July 11, 1968, the trustees of IDT, consisting of Jerre Paxton and Lorne House, named Jerre Paxton as "First Trustee" of IDT, giving him absolute veto power over the actions of the trustees. Because the trustees of IDT were granted unlimited power to amend the declaration of trust, we hold that this veto power was valid. In short, Jerre Paxton, as trustee, had the power to distribute any or all of the income and/or assets to the grantors but he also had that same power to distribute to himself. Accordingly, if he exercised that power in favor of the grantors it deprived him of what he could distribute to himself.
About the only argument which respondent offers to rebut the foregoing is that Jerre Paxton was a trustee and he could not exercise the power to amend or the power to distribute to himself except in his fiduciary capacity. We see little merit in this contention. *480 As trustee he had the power to distribute to himself not because he was a trustee but because he held certificates of interest in the trust, as did the grantors. There is nothing novel about a trust granting a trustee to distribute to himself as beneficiary. Petitioners rely upon Huffman v. Commissioner,39 B.T.A. 880 (1939), and we agree with petitioners. The power to amend the trust by Jerre Paxton as trustee can be exercised to favor Jerre Paxton as a holder of a certificate of interest. Jerre Paxton clearly held a substantial interest in IDT adverse to that of the grantors. Accordingly, the income of IDT is not taxable to the grantors. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Grace D. Paxton, docket No. 4644-76; International Development Trust, Jerre Paxton, Fiduciary, docket No. 4645-76; Kwik-Lok Corp. of Yakima, docket No. 4647-76; and Kwik-Lok Corp. of Indiana, docket No. 4648-76.↩
2. On brief, respondent concedes that the two corporations herein involved made a timely, valid election to treat any dividends paid by Kwik-Lok Corp. of Indiana to Kwik-Lok Corp. of Indiana in the taxable years ending in 1970 - 1972 as "qualifying dividends" under sec. 243(b), I.R.C. 1954↩.
3. Prior development or knowledge↩
*. Limited capability↩
4. A standard formula for converting income into the present value of the right to receive such income.↩
5. All section references are to the Internal Revenue Code of 1954, as amended.↩
1. An employee of Kwik-Lok Yakima. ↩
2. An attorney engaged in the practice of law in the State of Washington and a member of the firm retained by Kwik-Lok Yakima for some of its legal work.↩
6. For an interesting follow-up, see Thomas Flexible Coupling Co. v. Commissioner,14 T.C. 802 (1950), affd. 198 F.2d 350↩ (3d Cir. 1952).
*. Limited capability↩
7. This amount was obtained by dividing the gross sales of closures with labels ($149,278.54) by the gross sales price per unit ($4.50), and adding such amount ($149,278.54/$4.50 = 33,173 units) to the amount obtained by dividing the gross sales of striploks ($1,772,917.90) by the gross sales price per unit ($ .95): $1,772,917.90/$ .95 = 1,866,229 units. ↩
8. ↩
Gross profit per unit
.60 Times number of units
474,850.00 Gross profit
$284,910.00 Less Royalty payable under License Agreement
of April 30, 1965 [.075 X (474,850 X sales
price of $ .95)]
(33,833.00)
NET PROFIT
$251,077.00 9. ↩
Gross profit per unit
$ 3.175 Times number of units
474,850.000 Gross profit
$1,507,649.000 Less Royalty payable under License Agreement
of April 30, 1965--gross sales equal
$2,136,825: (474,850 X sales price of $4.50)
.075 of first $1 million
$75,000
.060 of second $1 million
60,000
.050 of $136,825
6,841
(141,841.000)
Less Royalty payable per year under February 21,
1969, sale of closure-with-label patents
(12 months X $28,901)
(346,812.000)
NET PROFIT
$1,018,996.000